**RED OAKS NURSING HOME, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 79–1680.**

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1980.

Decided Oct. 22, 1980.

John F. Neighbours, Indianapolis, Ind., for petitioner.

Susan Dolin, N.L.R.B., Washington, D. C., for respondent.

Before SWYGERT and PELL, Circuit Judges, and BAKER, District Judge.[*]

PELL, Circuit Judge.

Red Oaks Nursing Home, Inc., petitions for review of an order of the National Labor Relations Board. The Board has cross–applied for enforcement. The decision and order of the Board appear at 241 N.L.R.B. No. 65 (1979). The controversy arises from the efforts of the Retail Clerks Union, Local No. 37, to organize the service and maintenance workers at the Red Oaks Nursing Home in Michigan City, Indiana. The Board found that during the organizational campaign Red Oaks engaged in certain conduct which interfered with its employees' rights in violation of Section 8(a)(1) of the National Labor Relations Act. The Board concluded that this conduct constituted an unfair labor practice and justified setting aside the results of the representational election in which a majority of the employees had voted not to elect the union as their bargaining representative.[1] The Board, however, did not stop at setting aside the election. It also entered an order

---

[*] District Judge Harold A. Baker of the Central District of Illinois is sitting by designation.

[1]. The results of the election, held on October 21, 1977, were 39 votes against the union, 36 for the union, and 3 ballots subject to challenges. The challenged ballots were insufficient to affect the result of the election.

requiring, upon demand by the Clerks Union, that Red Oaks bargain with the union as the exclusive bargaining agent of its employees.

The Union's organizational campaign commenced in July 1977 and ended in October of that year when the election was held. During this time, the Board found, three management agents–Papunen, Dipert and Barth–engaged in conduct violative of Section 8(a)(1) by interrogating employees about their union activities and the union activities of others, creating the impression of surveillance of those activities, threatening reprisals because of those activities, and generally indicating to employees that the union had and would continue to lose employees' benefits and that selection of the union as a bargaining agent would be futile. We, of course, must respect these findings if they are supported by substantial evidence in the record as a whole.

We examine first the questions raised about the status of two of Red Oaks' employees. Red Oaks contends that Julia Johnson, the object of several of the employer's allegedly coercive remarks, is really a supervisory employee. Conversely, Red Oaks contends that Lorraine Barth, who allegedly engaged in some of the coercive conduct, was not a management agent whose conduct may be attributed to the employer.

■ The Board concluded that Johnson, notwithstanding her title as "assistant food supervisor," was not a supervisor within the meaning of Section 2(11) of the Act. We hold that substantial evidence supports this finding. Employee Johnson did have limited supervisory powers over other cooks during those times when the regular supervisor was absent and she did receive higher pay than the cooks. Nevertheless, her powers to direct other employees were narrow. She had no authority to discipline or settle the grievances of other employees. Unlike other regular supervisors, she was not salaried. Indeed, the employer originally stipulated to her inclusion in the bargaining unit, and she was permitted to vote in the election without challenge. We believe the evidence in the record fairly supports the Board's finding that Johnson exercised no substantial power in areas where independent judgment was required and that she was properly considered a lead person or "straw boss."

■ The question as to the status of employee Barth is a closer one. The Board found that insofar as the representational campaign was concerned, Barth was regarded by employees as a representative of the employer. Although the record shows that most of Barth's duties were clerical in nature and, indeed, some employees regarded her as merely the payroll clerk, she often did make contact with employees with respect to pay, insurance, and disciplinary matters. She also had the title of personnel director. When Red Oaks became aware of unionization efforts, and management meetings were called to discuss "do's and don'ts," Barth was invited to attend because of her frequent contact with employees on employment matters. Under these circumstances, we believe the Board could reasonably conclude that the employer was responsible for Barth's conduct, even though we query whether we would have reached the same conclusion were we making the decision in the first instance.

■ As to the question of whether Red Oaks violated Section 8(a)(1), we find that substantial evidence supports the Board's conclusion that several supervisors or agents of the employer engaged in conduct which would tend to coerce employees in the exercise of their rights guaranteed by the Act. We cite as examples some of what we regard as the most obvious violations of Section 8(a)(1). Virginia Papunen, the Director of Nursing, told employee Anderson, "I'll tell you one thing. If that union comes in here, I'm going to make it hard for you girls." The coercive tendency and threat of reprisal of statements such as this are clear. Less direct threats of reprisal were also made by dietary supervisor Dipert and personnel director Barth. Papunen also inquired about certain union activities by another employee and told her, "Well, we know about all the (union) meetings and

the parties that have been going on. ... We know everything the union is doing. You girls don't have to keep hiding it from us." Notwithstanding the fact that union organizing activities were fairly well known around the work place, we cannot disagree with the Board's conclusion that statements such as this created the impression of employer surveillance of the employees' union activities. Isolated comments to individual employees made by Dipert and Barth may well have created a similar impression. The evidence is less compelling as to the other charges such as that of soliciting grievances with the implication that they would be adjusted if the union were defeated and of creating the impression that benefits had been withheld because of the union or would be lost if the union were selected as the employees' representative. Nevertheless, after giving due deference to the Board's expertise to assess the conversations in the context in which they occurred and to judge their probable effect upon the employees, we are not prepared to disturb the Board's findings as unsupported by substantial evidence. We therefore deny the petition and enforce the order insofar as its findings concern the Section 8(a)(1) violations.

Having determined that Red Oaks violated Section 8(a)(1) of the Act, the Board issued a cease and desist order, required posting of notices, and also concluded that a bargaining order was appropriate under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Board has confined its defense of the bargaining order to that part of the *Gissel* decision which approves of bargaining orders in cases marked by "less pervasive [unfair labor] practices which nonetheless still have the tendency to undermine majority strength and impede the election process," 395 U.S. at 614, 89 S.Ct. at 1940, and does not argue that Red Oaks' conduct was so outrageous or exceptional as to merit a bargaining order without a showing of union majority support.

Red Oaks submits that the union never had the support of a majority of employees and that the entry of the bargaining order was therefore not proper as a remedy for the unfair labor practices. The Board found that, as of August 22, 1977, 43 of the 78 employees[2] signed valid authorization cards. Red Oaks argues that four of the authorization cards should not be counted in determining the union's majority status because the employees were misinformed by union representatives as to the purpose of the cards. Furthermore, another five cards are invalid, according to Red Oaks, because they were solicited by Johnnie Anderson, who never saw the employees sign the cards. Red Oaks contends that Anderson is not credible as a witness and her testimony establishing the validity of the cards is not worthy of belief.

■ In determining whether the authorization cards demonstrate majority support for the union, the Board "... must establish that the signer of the card did, in effect do what he would have done by voting in a Board election." *NLRB v. J. M. Machinery Corp.*, 410 F.2d 587, 591 (5th Cir. 1969), *quoted in Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 793 (7th Cir. 1979). The cards signed by the employees at Red Oaks had the following words printed on them:

YES, I WANT THE R.C.I.A.

I, the undersigned employee of [Company] authorize the Retail Clerks International Association (RCIA) Local # 37 to act as my collective bargaining agent for wages, hours and working conditions. I agree that this card may be used either to support a demand for recognition, N.L.R.B. election or a signature comparison, at the discretion of the Union.

■ Of course, when the terms of the card are unambiguous, as they are here, the authorization must be counted, unless its meaning "is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." *Gissel, supra*, 395 U.S. at 606, 89 S.Ct. at 1936. The record before the Board contains

---

**2.** This number includes Julia Johnson as non–supervisory personnel.

**508**

some testimony tending to cast doubt on the understanding of the employees signing the first group of four authorization cards challenged here. Doreen Moore, for example, testified that a union representative told her that the card was "To form a committee so there could be an election." Although this incomplete explanation of the card approaches the outer limit of valid solicitation, the union representative did not refute the unambiguous language of the card, and the Board's determination of the validity of Moore's card withstands challenge. Furthermore, although another employee, Ella Dennis, signed a card under the impression that the sole purpose of her signature was to obtain an election, she based this belief on what the President and Business Manager of Red Oaks, Donald Nixon, had told employees, not on anything union representatives said. Similarly, Betty Butts' testimony does not establish that she heard a deliberate misstatement about the purpose of the cards, nor is her impression of the purpose of the cards attributable directly to any union agent:

Q Did anyone mention to you that the card would be used for the purpose of getting an election?

A I understood the card to mean they needed so many to–so many cards to be signed before they could have an election. So I put my name on there so that they would be able to–

Q Did anyone tell you that at that meeting that they needed so many cards to be signed before they could get an election?

A Not at the meeting. That was the word, you know, through other girls.

■ Red Oaks, as stated above, challenges the five cards solicited by Johnnie Anderson because Anderson did not see them signed. Anderson did testify that the employees gave the cards to her to turn in, and her testimony on this subject was not contradicted. We therefore conclude that the Board's decision to count these cards was supported by substantial evidence.

■ Even when a union is able to show majority support through authorization cards, however, the preferred method of establishing the union's representative status is by means of a secret ballot election. The Board has failed to supply any basis, other than the occurrence of the Section 8(a)(1) violations discussed above, to justify bypassing a rerun election. It is well settled that the issuance of the severe remedy of a bargaining order requires more, and, accordingly, this portion of the Board's order cannot stand.

■ Since the Supreme Court's decision in *Gissel*, the NLRB has been obligated to give reasons justifying the use of a bargaining order. In *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108 (7th Cir. 1973), this court explained the importance of the Board's obligation to give "a detailed analysis" of the "possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies," 484 F.2d at 1118, as an aid to judicial review. In its brief here, the Board, citing *Gissel, supra*, admonishes us that "[t]he determination of when such a bargaining order is appropriate has been entrusted to the discretion of the Board, which 'draws on a fund of knowledge and expertise all its own....'" Ironically, even a cursory examination of the decisions applying *Gissel* in this circuit and in other circuits reveals that the Board has declined repeatedly to assist the courts with this expertise by revealing reasons for issuing *Gissel* bargaining orders. *See, e. g., First Lakewood Associates v. NLRB*, 582 F.2d 416 (7th Cir. 1978); *C & W Super Markets, Inc. v. NLRB*, 581 F.2d 618 (7th Cir. 1978); *Walgreen Co. v. NLRB*, 509 F.2d 1014 (7th Cir. 1975); *NLRB v. Gruber's Super Market, Inc.*, 501 F.2d 697 (7th Cir. 1974); *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108 (7th Cir. 1973); *Self–Reliance Ukrainian American Cooperative Association v. NLRB*, 461 F.2d 33 (7th Cir. 1972); *NLRB v. Henry Colder Co.*, 447 F.2d 629 (7th Cir. 1971); *NLRB v. Drives, Inc.*, 440 F.2d 354 (7th Cir. 1971), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185; *NLRB v. Kostel Corp.*, 440 F.2d 347 (7th Cir. 1971); *NLRB v. Appletree Chevrolet, Inc.*, 608 F.2d 988

(4th Cir. 1979); *Hedstrom Co. v. NLRB,* 558 F.2d 1137 (3d Cir. 1977); *Automated Business Systems v. NLRB,* 497 F.2d 262 (6th Cir. 1974); *Daisy's Originals, Inc. v. NLRB,* 468 F.2d 493 (5th Cir. 1972); *NLRB v. World Carpets of New York, Inc.,* 463 F.2d 57 (2d Cir. 1972). Furthermore, this reticence persists despite repeated judicial references to the importance of the Board's making known its reasoning as an aid to judicial review. A remand for a statement of the Board's reasons has in the past proved futile, *see NLRB v. Henry Colder Co.,* 447 F.2d 629 (7th Cir. 1971), and, typically, this court has reached the merits of the propriety of the order, in part to avoid further compromise of employee rights inherent in the delay of remand. *See, e. g., id., Peerless of America, Inc. v. NLRB, supra, Walgreen Co. v. NLRB, supra.* Thus, the effect of the Board's continuing neglect to fashion standards for the exercise of its discretion is to place exclusive reliance on judicially-prescribed standards for determining the need for bargaining orders, a practice not contemplated by section 10(c) of the Act. 29 U.S.C. § 160(c). *See Gissel, supra,* 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32.

It is unfortunate that this fundamental question of employee representation rights should receive so little attention from the Board and should be the subject of the long delays of remand necessitated by the Board's failure to act in the first instance. Because the Board acknowledges the importance of these rights, however, we decline to view the Board's inaction as the result of a flagrant disregard for their duties under the law. Rather, except in extreme cases where the reasons for the Board's decision, although not expressly stated, are obvious, *see Walgreen Co., supra,* 509 F.2d at 1018–19, we think it appropriate to presume from the legal principle that elections are the preferred means for determining representative status and from the absence of express articulated consideration, that the

necessary requirements for a bargaining order prescribed in *Gissel* are not present.[3]

On the subject of the bargaining order now before us, the ALJ and the Board made only the following conclusory statements:

I do not, however, consider the unfair labor practices committed to be minor in view of their nature, number, and extent of probable impact throughout the bargaining unit. In my opinion, neither the factors recited above nor the Board's traditional remedies for Section 8(a)(1) violations render it likely that another election would result in a truer measure of uninhibited employee choice than the authorization cards executed on or before August 22, 1977. I therefore in all the circumstances of this case find that the Respondent's unfair labor practices have undermined the Union's majority and made the holding of a fair election most unlikely, and recommend that the petition in Case 25–RC–6717 be dismissed and the Respondent be ordered to bargain on request.

In its brief, the Board has attempted to supply a basis for the bargaining order by relying on the ALJ's discussion of the impact of the employer's actions in the context of determining whether a Section 8(a)(1) violation occurred. To be an unfair labor practice, however, conduct need not have as demonstrably severe an impact on employee rights as conduct requiring a bargaining order. Thus, this discussion, which applies a lesser impact standard than that required for a bargaining order is no substitute for the reasoning needed to support a bargaining order. Furthermore, the opinion of the ALJ contains no consideration of the effectiveness of the ordinary remedies, the continuing impact of the unfair labor practices on the election process, and the probability of repeated violations, which are also prerequisites for a bargaining order.

**3.** We note, and direct the attention of the Board to, a recent case of this court in which a reversal resulted from trial conduct of a government attorney despite repeated admonitions of this court in prior cases warning of the impropriety of the conduct. *United States v. Rodriguez,* 627 F.2d 110 (7th Cir. 1980).

*See Peerless, supra,* 484 F.2d at 1118. By not stating separately why the circumstances of this case require a bargaining order, the Board appears in effect to be automatically issuing bargaining orders on the basis of virtually *any* unfair labor practice, a policy clearly not in accordance with *Gissel. See NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988, 998 (4th Cir. 1979).[4]

Nothing else in the record rebuts the presumption that the Union representative status is best determined by a secret ballot election. First the Board found only violations of Section 8(a)(1), and no retaliatory or discriminatory action against employees took place. Statements like the ones that occurred here "are more likely to express individual views and less likely to influence an employee's decision than statements by high–level officials which bear the imprint of company policy." *NLRB v. Chatfield–Anderson Co.,* 606 F.2d 266, 268 (9th Cir. 1979). Here, the leaflets, speeches, and other company campaign presentations affirmed employee rights and contradicted the statements of Papunen, Dipert, and Barth. Moreover, despite the allegedly "egregious" conduct that occurred here, there was little change in the number of employees who signed authorization cards, 43 of the 78 employees, and those that voted in favor of the union, 36 employees. Certainly the evidence shows no great exodus of support for the union.

▮ Prior to the time of the hearing, there had been a 35 percent employee turnover, and by the time of the entry of the bargaining order, this turnover had risen to approximately 64 percent. Of the employees directly involved in the unfair labor practices, only 50 percent or 6 of 12, remained. The Board argues, however, that consideration of employee turnover in determining the propriety of a bargaining order conflicts with the decisions of this court in *NLRB v. Kostel Corp.,* 440 F.2d 347 (7th Cir. 1971), and *NLRB v. Drives, Inc.,* 440 F.2d 354 (7th Cir. 1971), *cert. denied,* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185. The concern of these decisions, however, was that "employee turnover since the original entry of the bargaining order," *Kostel, supra,* 440 F.2d at 353, not be considered, because of the possibility that the employer might use protracted litigation as a device to defeat the bargaining order. Later, in *Peerless,* we expressly noted that "a change in the employee complement may be a relevant consideration in deciding whether to issue a bargaining order." 484 F.2d at 1117 n.13. This distinction between pre– and post–order turnover has been expressly recognized by at least one other circuit. *See NLRB v. Western Drug,* 600 F.2d 1324, 1326 (9th Cir. 1979). Thus, although *Peerless* indicated that turnover was not a decisive consideration, *see* 484 F.2d at 1121, turnover nevertheless militates against a bargaining order in close cases.

Finally, the most compelling evidence that a bargaining order was not warranted is the clear evidence in the record that the employer's unfair labor practices did not drive the employees directly involved to abandon the union. The record contains a union leaflet, dated three days before the election, with the signatures or photographs accompanied by union testimonials of virtually every employee directly involved in the unfair labor practices.[5]

---

**4.** In *Appletree Chevrolet, Inc.,* the court similarly observed:

The administrative law judge apparently assumed that by merely repeating the magic words "pervasive and egregious" and by simply engaging in "perfunctory or 'boilerplate'" language, or using "'a litany reciting conclusions by rote without factual explication,'" he had met the criteria established by *Gissel.* This is manifestly insufficient to meet the test for a bargaining order.... To approve such a procedure would be to approve in effect the automatic issuance of bargaining orders in any case where the Board declared the misconduct of the employer to be "pervasive and egregious."
608 F.2d at 998 (footnotes omitted).

**5.** One of the 8(a)(1) violations, for example, concerned Papunen's discussion of Annie Fleming's request to change to an 80 hour from a 64 hour work schedule. According to the testimony, Papunen implied to Fleming that a change was not possible because of the union. Apparently, Papunen did not convince Fleming, whose photograph appears on the union leaflet, accompanied by this statement:

The Board has offered only conclusory descriptions of the employer's conduct as serious and pervasive. Perhaps such conduct could devastate the chance of a fair election, but nothing in the record before the Board called for such a conclusion here. Further, with respect to the likelihood of any future election being a fair one, we cannot be unmindful that an employer, who has been found guilty of unfair labor practices with the order enforced by this court, will presumably, in view of the possibility of contempt proceedings in the event of a violation of that order, be under substantial constraint to conduct itself so as not to violate the enforceable order. Accordingly, we hold that paragraphs 1(g) and 2(a) of the Board's order and the notice required by paragraph 2(b) shall not be enforced and the order and notice shall be so modified.

In sum, the Board's decision and order offers no basis for the bargaining order other than the showing of a card majority and the unfair labor practices that occurred prior to the election. The record of the proceedings before the Board offers no further basis for such an order. Unless the unfair labor practices were sufficiently pervasive to undermine the union's majority and impede the election process, a bargaining order is not warranted.

 The ALJ's Decision, after listing seven specific prohibitions against unfair labor practice conduct, added an eighth catchall restriction reading:

> In any like or related manner interfering with, restraining, or coercing its employees in the exercise of their rights guaranteed in Section 7 of the Act.

The notice ordered to be posted contained similar language. The Board adopted the recommended order of the ALJ with the exception of substituting the phrase "in any other manner" for the phrase "in any like or related manner." This, in effect, would make the employer subject to contempt pro-

cedures for any future violation of Section 7 even though the conduct was wholly unrelated to the broad spectrum of specific restrictions which are included in the ALJ's order. We think the substituted language of the Board is unnecessarily broad. Accordingly, as this court did in *NLRB v. Westinghouse Electric Corporation*, 603 F.2d 610, 618 (7th Cir. 1979), we hold that the portion of the cease and desist order and the accompanying notice to employees should be phrased in accordance with the original cease and desist order as entered by the ALJ pertaining to the general restriction on other violative conduct.

We find further support for the position we have taken on this issue in the record of a case recently argued in this court, in which case the Board went in the opposite direction to the course pursued in the present case. In *American Diversified Foods, Inc. v. National Labor Relations Board*, No. 80–1051, argued September 10, 1980, the Board affirmed the numerous findings and conclusions of the ALJ but modified his remedy in part, stating the following:

> We hereby modify the recommended Order to include both the full cease and desist and the reinstatement language traditionally used by the Board, which the Administrative Law Judge inadvertently omitted.

This modification, insofar as pertinent here, was as follows:

> (b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

The ALJ's order had read as follows:

> Unlawfully interfering with, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

For the reasons hereinbefore set out, the Board's order is ordered enforced except as

---

What about the Open door Policy. For over a year now we have been trying to get 80 hours every two weeks so we don't have to have the pay period where we only get 64 hours. Red Oaks' stock answer has always

been, there is nothing we can do, the schedule is going to stay like it is. We feel the union can get us 40 hours a week if we want it.

modified in the manner referred to hereinbefore in this opinion.