**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**VILLAGE IX, INCORPORATED, d/b/a Shenanigans, Respondent.**

No. 83–1432.

United States Court of Appeals, Seventh Circuit.

Dec. 29, 1983.

William Stewart, Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Marc J. Ansel, Erwin, Martinkus Cole & Ansel, Ltd., Champaign, Ill., for respondent.

Before PELL, POSNER, and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

The Labor Board found that a company that owns a restaurant called "Shenanigans" in Decatur, Illinois had engaged in eight unfair labor practices in the course of an organizing campaign, in violation of sections 8(a)(1) (interference with employees' protected activities) and 8(a)(3) (discrimination in terms or conditions of employment to encourage or discourage union membership) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3). The Board ordered the company to cease and desist from the violations and to post the usual notices assuring the employees that it would desist, and also ordered the company to bargain with the union as the exclusive representative of Shenanigans' workers, even though the union had lost the representation election. The company in its opening brief in this court asked us to set aside only four of the Board's unfair labor practice findings, plus the bargaining order. But the Board in its brief undertook at considerable length to defend even the uncontested findings, in order that, as the

Board's attorney explained at argument, we might get the full "odor" of the company's conduct. Not surprisingly, this led the company in its reply brief to attack those findings, and we conclude that the correctness of all of the unfair labor practice findings is before us insofar as their correctness bears on whether the Board's bargaining order should be enforced.

In March 1980, a few months after Shenanigans opened, a waitress named Dee Griffiths received union-authorization cards from the United Retail Workers Union to give to the other employees. Assisted by her husband Ralph (not an employee) she became the principal organizer of the employees and held frequent meetings with them in her home during March and April. On April 13 Mrs. Griffiths called in sick to Shenanigans, but she was not sick; she was conducting an organizational meeting. The company found out about this and fired her the next day. This is the first of the unfair labor practices found by the Board.

Also on April 13 one of the company's co-owners, Block, made a speech (which was tape recorded) in which he told the employees that the restaurant business was highly competitive and that

> Unions do not work in restaurants .... The balance is not here .... If the Union exists at Shenanigans, Shenanigans will fail. That is it in a nutshell.... I won't be here if there is a Union within this particular restaurant. I am not making a threat. I am making a statement of fact.... I respect anyone who wants to join the Union if that in essence is a workable place and can afford to pay Union wages. We can't in the restaurant business.

He said the only restaurant in Decatur that was unionized was struggling, and if Shenanigans raised its prices in order to pay union wages its customers would switch to the nonunion restaurants, whose prices would be lower. He added:

> Shenanigans can possibly exist with labor problems for a period of time. But in the long run we won't make it. The cancer will eat us up, and we will fall by

the wayside. And if you walk into this place five years down the road, if there is a Union in here, then I guarantee you it won't be a restaurant. I don't know what it will be. But wherever you people will be working in this town, in Decatur, it will not be in a Union restaurant. It will be in a non-Union restaurant, because there is a Union in town, it's at the Sheridan, and I think they only use one or two waitresses during the week and maybe three on the weekends. And you get Union wages, and I doubt if you get hardly any tips.

> I am not making a threat. I am stating a fact. When you are dealing with the Union you had better consider the pros and cons. I am sure there is a lot of pros that are involved. I haven't looked into them in that great of detail because this is my first experience with them. I only know from my mind, from my heart and from my pocketbook how I stand on this. And I don't like the idea of looking at a Union as far as my employees are concerned.

The Board held that this speech was coercive.

Mrs. Griffiths complained to the Board about her discharge, and the Board and the company entered into a settlement agreement whereby the company agreed to reinstate her with back pay. She returned to work on November 20, 1980, and the same day the company announced that distributing any campaign literature on company time was forbidden. The Board found that this "no-distribution rule" violated section 8(a)(3) because it had been adopted in order to impede the union's organizing effort, and that it violated section 8(a)(1) because it extended to nonwork areas of the restaurant and nonworking time during the work day.

Ralph Griffiths had been accustomed to pick up his wife at the restaurant after work. Often he would arrive early—sometimes hours early—and pass the time in the restaurant, soliciting employees to join the union. The company forbade him to solicit and when he continued doing so banned him

completely from the restaurant. This was held to be an unfair labor practice too.

The other four unfair labor practice findings grow out of a party that the company threw for Shenanigans' employees in January 1981 (the anniversary of its opening), two days before the election, at a different restaurant but one owned by the company's owners. Mrs. Griffiths and another known union adherent, Miss Tuttle, received invitations postmarked the day of the party and thus not delivered till it was too late; and when Miss Tuttle later complained to Block he said, "You didn't deserve one, bitch." The Board found that the company had deliberately delayed mailing invitations to the two employees and by doing so had discriminated against them because of their union activities, in violation of section 8(a)(3). At the party Block and his co-owner asked a retarded employee whether any union people had visited him in his home. He said they had. This was the end of the conversation, but the Board held that the questioning violated section 8(a)(1). Finally, in the parking lot outside the restaurant, Miss Tuttle along with two nonemployee union organizers put leaflets under the windshield wipers of the parked cars. Block ordered them removed and also knocked down one of the organizers, Ryan, who was putting a leaflet on Block's car. (Ryan was not hurt, and Block was not arrested.) The removal of the leaflets and the assault on Ryan were held to be unfair labor practices.

By December 22, 1980, the union had received signed authorization cards from 28 of Shenanigans' 47 employees. (Most of these cards had been secured back in March and April, when the organization campaign began.) The union petitioned for a representation election, and it was held on January 22. The union lost by a vote of 28 to 12.

 With respect to the first and last (chronologically) of the alleged unfair labor practices—the discharge of Mrs. Griffiths and the assault on Ryan—the Board's findings are amply supported. Although Mrs. Griffiths called in sick when she was not sick, she arranged for another waitress to take her place; and since this type of substitution (not dependent on illness) was common at Shenanigans, the Board was entitled to infer that Mrs. Griffiths had been fired not because she had failed to show up for work as scheduled but because she was the leader of the organization campaign. As for Block's assault on Ryan, it is the Board's position, which was upheld in *Heavenly Valley Ski Area v. NLRB,* 552 F.2d 269, 273 (9th Cir.1977); cf. *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 691 (7th Cir.1982), that assaulting a union organizer in the presence of one or more employees of the company being organized violates section 8(a)(1) because an onlooker is likely to infer that if the company would assault an organizer it would also retaliate in some fashion against an employee who supported the union. Of course if Block had been acting reasonably in self-defense or defense of property such an inference by an onlooker would have been unreasonable. And he testified that the tires of his car had been slashed recently and when he saw someone bending over his car he thought the car was about to be damaged again. This is possible but the record entitled the Board to find, to the contrary, that Block knew full well what Ryan was doing and assaulted him in order to prevent him from distributing union leaflets. It is immaterial that, as the Board also found, Ryan had no right to distribute leaflets on private property without the owner's permission. The company does not argue that Block would have been justified in assaulting Ryan merely to protect a technical property right without a previous demand that he leave (there was none).

 The no-distribution rule and preventing Miss Tuttle from distributing leaflets in the parking lot on the night of the party present related issues. Employees' rights of self-organization are not absolute, and yield to the company's right to operate its business without undue disruption. *NLRB v. Browning-Ferris Industries,* 700 F.2d 385, 388–89 (7th Cir.1983); *id.* at 390–91 (concurring opinion). A company may

therefore prohibit union soliciting and leafletting while its employees are supposed to be working, provided that the rule is applied—as it was here—to anti-union as well as pro-union leafletting. "Working time is for work." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945); *Cameron Iron Works, Inc. v. NLRB*, 464 F.2d 609, 610 (5th Cir.1972) (per curiam). The Board found, however, that the company's rule was too broad because it did not allow soliciting during lunch breaks and other nonworking intervals. Compare *NLRB v. General Thermodynamics, Inc.*, 670 F.2d 719, 721 (7th Cir.1982).

The rule was never written down, and the only evidence of its content is testimony that the assistant manager of the restaurant told Mrs. Griffiths that "there would be nothing distributed on Company time ...." Lunch breaks are not company time. Of course the rule may have been construed more broadly by the company. We do not know because no one tried to find out how broad it was. Maybe Mrs. Griffiths was afraid to distribute a union leaflet during a lunch break and see what happened to her, but she could at least have asked the management whether leafletting during lunch breaks or in other nonworking intervals was permitted, and she did not. One of the nonemployee organizers, who could not be threatened with loss of his job, also might have asked, but none did.

■ We doubt that it is an unfair labor practice for a company simply to fail to specify the precise limitations of a no-distribution rule when specification has not been requested, though there is contrary authority. See *Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1230–31 (5th Cir.1976); *NLRB v. Miller*, 341 F.2d 870, 874 (2d Cir.1965). But we need not decide the question in this case, as the Board's finding of an unfair labor practice must be upheld on another ground. The rule was adopted on the day Mrs. Griffiths was reinstated, and the Board was entitled to infer from this timing that the rule was adopted purely because the company wanted to impede the union's battle for recognition. True, the rule was applied evenhandedly to pro-union and anti-union leafletting. But since the union was the challenger, the company may have thought that a ban on all campaign publicity during working time would hurt the union more. This would not matter if the ban had been in force from the time the restaurant opened, or even from some later date provided it was unrelated to the organization drive; but the timing of its adoption suggests that the purpose was not to reserve work time for work but to make it harder for the union to win an election.

■ The Board's finding that it was an unfair labor practice to prevent Miss Tuttle from distributing union leaflets in the parking lot must also be upheld. As this was non-working time, the distribution could not have disrupted the company's work. Although it took place on private property, that is also true when an employee distributes a union leaflet on the company's premises during a lunch break. See *Republic Aviation Corp. v. NLRB, supra*, 324 U.S. at 796, 802 n. 8, 803, 65 S.Ct. at 984, 987 n. 8, 988. And although the premises where the distribution was attempted were not the premises where the work force was being organized, not only were they under common ownership but, more important, Shenanigans' owners had invited all of its employees there. Miss Tuttle herself, so the company contends, was an invitee, though she did not receive a timely invitation. She was properly in the parking lot, and the distribution of leaflets there would not have interfered with the owners' property rights except in the most technical of senses.

■ We also, although with reservations, uphold the Board's finding that the delay in mailing Mrs. Griffiths and Miss Tuttle invitations to the anniversary party was an unfair labor practice. Disagreeing with the administrative law judge on this point, the Board decided that Block's obvious hostility to both employees (Mrs. Griffiths, whom he had fired, and Miss Tuttle, whom he called a bitch to her face on the night of the party) justified an inference that the invitations were deliberately mailed late. Block

had wanted to invite only company supporters to the party, which he considered a part of the campaign against the union. The restaurant's manager testified that he ignored Block's wishes; the party had been billed as an anniversary party, and he believed therefore that all employees should be invited. And the manager handled the sending of the invitations. Although there is no direct evidence as to why the invitations to the two employees were delivered late, it is possible that the manager, to curry favor with Block, his boss, delayed the mailing of the invitations. Another possibility is that the secretary who mailed them, or the post office, was innocently responsible for the delay. But as the two employees in question were the leading union supporters at Shenanigans, the coincidence seems rather too pat. The Board was therefore entitled, though not compelled, to infer that Shenanigans had engaged in shenanigans over the invitations.

▪ We cannot uphold the Board's remaining unfair labor practice findings. The speech of April 14 presents the most interesting and difficult question. On the one hand it is apparent from section 8(c) of the Act (on which see *NLRB v. Golub Corp.,* 388 F.2d 921, 926–28 (2d Cir.1967)), and from the use of the electoral process to determine representation, that the company has a right to state its side of the case. On the other hand the company may not threaten retaliation against workers for voting for the union, and a potent form of retaliation is to close down the plant or facility, thereby throwing all the workers out of work. Since the only effective way of arguing against the union is for the company to point out to the workers the adverse consequences of unionization, one of which might be closure, it is often difficult in practice to distinguish between lawful advocacy and threats of retaliation. See Gorman, Basic Text on Labor Law 151–56 (1976); 1 The Developing Labor Law 108–15 (Morris 2d ed. 1983). Analytically, however, the line is clear. To predict a consequence that will occur no matter how well disposed the company is toward unions is not to threaten retaliation; to predict a consequence that will occur because the company wants to punish the workers for voting for the union—a consequence desired and freely chosen by the company rather than compelled by economic forces over which it has no control—is. *NLRB v. Golub Corp., supra,* 388 F.2d at 928.

Block's speech offered a competent if extremely informal analysis of likely economic consequences of unionization in a highly competitive market in which most companies are not unionized—the restaurant market in Decatur. See, e.g., Ehrenberg & Smith, Modern Labor Economics 350, 356 (1982); Rees, The Economics of Work and Pay, ch. 10 (1973); Burton, *Economic Impact of Unions,* in Meltzer, Labor Law 87 (2d ed. 1977). Once a union is recognized as collective bargaining representative it will press for a wage increase in order to show that the workers have gained something from union representation. At the very least it will insist on a big enough increase to cover the dues that the workers will be required to pay the union for representing them. If the market is highly competitive and the competitors are not unionized, the newly unionized company may not be able to recoup a significant part of its higher wage bill by raising its prices. Instead it will try to reduce its costs, possibly by laying off some workers, as apparently had happened at the one unionized restaurant in Decatur. (The Board has not questioned the factual accuracy of any of the statements in Block's speech.) Of course it would not be in the workers' interests for the union to press for such hefty wage increases that the company decided to close the restaurant. But because there is a lot of uncertainty inherent in estimating the precise effect of a change in wages on a company's cost structure and hence competitive vitality, and because in highly competitive industries (and the restaurant business is one) unions usually press for uniform wages across the entire market, see Rees, The Economics of Trade Unions 57–58 (2d rev. ed. 1977), which may cause the weaker companies to go under, the closing of the restaurant might be the eventual outcome

of the collective bargaining process even if the company made every effort to keep it open. It is well known that union wage demands sometimes result in plant closings. For example, some of the shift of industry in recent decades from North to South is apparently a consequence of the much lower rate of unionization in the South compared to the North, see Bluestone & Harrison, The Deindustrialization of America 165–69 (1982), and this movement cannot be due wholly to the actions of companies that could well afford to pay union wage scales but decided instead to retaliate by moving their plants.

 Because the line between predicting adverse consequences and threatening to bring them about is a fine one, "the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control . . . ." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); see also *NLRB v. Berger Transfer & Storage Co., supra,* 678 F.2d at 690. But Block provided objective support for his prediction of the consequences of unionizing Shenanigans by pointing to the competitive nature of the restaurant business and to the fact that only one restaurant in Decatur was unionized and it was doing badly. More was not required in the circumstances; we do not read *Gissel* to require the employer to develop detailed advance substantiation in the manner of the Federal Trade Commission (see *Pfizer, Inc.,* 81 F.T.C. 23, 61–64 (1972)), at least for predictions founded on common sense and general experience. A small company in the restaurant business should not have to hire a high-powered consultant to make an econometric forecast of the probable consequences of unionization on the restaurant business in Decatur. The usual assumption that employers hold all the cards in dealing with employees is reversed when a large national union is waging an organizational campaign against a small service company. The company may not threaten retaliation; but the tenor of Block's remarks, remarks for which there was some objective basis, was not that the company would close the restaurant out of spite if the union got in but that he believed the restaurant business in Decatur too fragile for a restaurant to survive if union wage scales were paid. To forbid expression of that opinion would not serve the interests of Shenanigans' employees, for unionization might in fact hurt rather than help them in the long run. And the fact that the speech was recorded dispels any basis for arguing (and the Board does not argue) that its inflection may have conveyed a retaliatory message that the words themselves did not.

 Block's description of the union as a "cancer" was not enough to turn a prediction into a threat of reprisal. Cf. *Mount Ida Footwear Co.,* 217 N.L.R.B. 1011, 1013 (1975). The Eighth Circuit held a much tougher speech not to be an unfair labor practice in *NLRB v. Intertherm, Inc.,* 596 F.2d 267, 277–78 (8th Cir.1979), where the employer told the workers: "I have dealt with a number of unions in which I have had to shut down plants, or move them elsewhere. I've sat at the bargaining table and told an international union that you'll either have to agree to the company's position or we'll shut the plant down. They didn't believe me and we shut the plant down. These are not threats, these are simply facts showing what I think all of you really understand." An empirical study of representation campaigns found that such speeches do not swing many votes. See Getman, Goldberg & Herman, Union Representation Elections: Law and Reality 118–20 (1976).

*Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1137 (7th Cir.1974), on which the Board relies, is distinguishable. The employer's owner stated that he could not afford to pay union wages, but he made no attempt to provide objective support for this statement. Also distinguishable are cases like *NLRB v. National Fixtures, Inc.,* 574 F.2d 1305, 1306 (5th Cir.1978) (per curiam), where the threat of reprisal was explicit, or so nearly so as to be unmistakable ("There ain't no goddamned union coming in here. I'll shut the doors first."); *NLRB*

*v. Kaiser Agricultural Chemicals,* 473 F.2d 374, 381 (5th Cir.1973), where "The employees could reasonably have inferred that these events [a litany of horrors, including strikes, plant closings, and loss of benefits] would result not from the inevitable forces of the market, but from the deliberate acts of the company taken in reprisal"; and *Gissel* itself, where "the Board could reasonably conclude that the intended and understood import of [the message conveyed by a whole series of company speeches, pamphlets, leaflets, and letters] was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities," 395 U.S. at 619, 89 S.Ct. at 1943. We do not pretend that the course of decisions in this or other courts of appeals has established an unwavering line between permitted and forbidden employer predictions. *Weather Tamer, Inc. v. NLRB,* 676 F.2d 483, 488–90 (11th Cir.1982), for example, although not cited by the Board, provides support for its position in this case. But we are persuaded that the Board's conclusion that Block's speech was coercive is not supported by substantial evidence and therefore cannot be used to support the bargaining order that the Board issued.

We come next to the barring of Mr. Griffiths from Shenanigans. Just as a company may prevent the distribution of leaflets during working time, so it may (with immaterial exceptions) bar a union organizer from soliciting employees during working time. *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). Mr. Griffiths was barred from the restaurant only after he disregarded warnings that he was not to solicit while waiting for his wife. Only in special circumstances not present here must a company allow nonemployees to solicit on its property for a union. The administrative law judge held that the ban was not an unfair labor practice, but the Board disagreed on the novel ground that by barring Mrs. Griffiths' spouse from waiting for her in the restaurant while allowing spouses of other employees to continue to do so the company was discriminating against her on account of her union activities. This assumes that there was no valid basis for the company's distinguishing between her spouse and the other employees' spouses, but there was: her spouse was soliciting employees on company time; the other spouses were not. There is no evidence, and it defies common sense to suggest, that if Mr. Griffiths had been the spouse of another employee (who happened not to be a union adherent), and had solicited employees on duty, the company would have let him do so. It did not ban Mr. Griffiths because his wife was a union adherent but because he was a nonemployee soliciting for the union on company time; hence it was not discriminating against her.

The questioning of the retarded employee at the party was limited to asking him whether he had been visited in his home by union organizers. Nothing in the circumstances (with which compare *NLRB v. Sure-Tan, Inc.,* 672 F.2d 592, 597 (7th Cir.1982), cert. granted, —— U.S. ——, 103 S.Ct. 1270, 75 L.Ed.2d 492 (1983)) suggests that the question had a natural tendency to discourage him from voting for the union. And far from supporting a per se rule that asking an employee a question about union affiliation violates section 8(a)(1), the cases—the Board's as well as the courts'—make clear that there is no such rule. See, e.g., *Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23, 31 (7th Cir.1980); *Bourne v. NLRB,* 332 F.2d 47, 48 (2d Cir.1964); *Blue Flash Express, Inc.,* 109 N.L.R.B. 591, 593 (1954). An employer in planning his campaign has a legitimate interest in finding out whether the union has approached his employees, and if he merely asks—without pressing the inquiry when the employee balks, or following up with coercive statements—he has not violated the statute. Although the employee in question is described as being "retarded," to what degree is not indicated. The administrative law judge mentions the fact of retardation but neither he nor the Board ascribed any significance to it.

We must now consider whether the unfair labor practice findings that we

have upheld support the issuance of a bargaining order. There has been over the years much adverse comment, including by this court, on the Board's stubborn refusal, well illustrated by the administrative law judge's opinion in this case, to make adequate findings to support the issuance of a bargaining order in cases where the union, having lost the election, cannot be considered the presumptive choice of the employees to bargain with the employer on their behalf. See, e.g., *NLRB v. Century Moving & Storage, Inc.,* 683 F.2d 1087, 1093 (7th Cir.1982); *Red Oaks Nursing Home, Inc. v. NLRB,* 633 F.2d 503, 509 (7th Cir. 1980); *First Lakewood Assocs. v. NLRB,* 582 F.2d 416, 423 (7th Cir.1978); *NLRB v. Gruber's Super Market, Inc.,* 501 F.2d 697, 704 (7th Cir.1974); *NLRB v. General Stencils, Inc.,* 472 F.2d 170, 173–75 (2d Cir.1972); Note, *Representative Bargaining Orders: A Time for Change,* 67 Cornell L.Rev. 950, 959–63 (1982); Comment, *A Reappraisal of the Bargaining Order: Toward a Consistent Application of NLRB v. Gissel Packing Co.,* 69 Nw.U.L.Rev. 556, 565 (1974). This refusal would provide a compelling argument for remanding the bargaining-order phase of the case even if we had upheld all of the Board's unfair labor practice findings. Since we have not upheld them all, the argument for remand is even stronger: the Board itself might not believe that the remaining findings justified such an order. However, despairing that the Board could be induced to make adequate findings in bargaining-order cases, this court in recent years has not remanded in such cases but has instead made its own determination of whether a bargaining order is warranted, and when it finds that it is has upheld the Board's order. See, e.g., *Walgreen Co. v. NLRB,* 509 F.2d 1014, 1019 (7th Cir.1975). It may be doubted whether this procedure is fully consistent with the rule of *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), which, applied to the Labor Board's regulatory domain, is that the making of labor policy is for the Board and not the courts. But it is consistent with *Chenery* for us to determine whether the Board, if it issued a bargaining order on the basis of the unfair labor practice findings that we have upheld, would be exceeding its authority; for if it would be, then a remand to let it decide whether to reissue the order—an order we would have to set aside on the company's appeal from it—would be a complete waste of time, and as we noted just the other day *Chenery* does not require pointless remands. *Illinois v. ICC,* 722 F.2d 1341, at 1348–1349 (7th Cir.1983).

 To require a company to negotiate for a collective bargaining contract with a union that has lost a representation election is an extreme remedy, reserved for extreme cases. See, e.g., *Red Oaks Nursing Home, Inc. v. NLRB, supra,* 633 F.2d at 509–10; *NLRB v. Gruber's Super Market, Inc., supra,* 501 F.2d at 703–05; *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1118–22 (7th Cir.1973). It goes against the grain of the National Labor Relations Act, which requires a company to negotiate only with a representative selected by majority vote of the members of the bargaining unit. Few would argue that if one of the political parties tried improperly to discourage voters from voting for another party and the other party lost, the losing party's candidate should nevertheless be awarded the office he was seeking. See *Developments in the Law—Elections,* 88 Harv.L.Rev. 1111, 1321–22 (1975). Of course representation elections are not carbon copies of political elections, but it is not clear which way this cuts; it is easier to rerun a representation election on short notice than a political election. In any event, to give employees a collective bargaining representative that they do not want, as a way of punishing their employer for committing unfair labor practices, is so discordant with the basic philosophy of the Act that a bargaining order will not (except in the most egregious circumstances, and maybe not even then, see *Conair Corp. v. NLRB,* 721 F.2d 1355 at 1377–1384 (D.C.Cir.1983)) be issued unless the union had a card majority and the unfair labor practices were so serious that employees would be intimidated from voting their true preferences in a new election

even if no unfair labor practices were committed in the campaign leading up to that election and even though the new election (like the old) would be by secret ballot. We have held these conditions satisfied only where the employer's unfair labor practices were both serious and numerous, as in *Justak Bros. & Co. v. NLRB,* 664 F.2d 1074, 1077–79 (7th Cir.1981), where the six *categories* of unfair labor practices in which the employer was found to have engaged must have included many separate violations, or *Walgreen Co. v. NLRB, supra,* 509 F.2d at 1019, where we described the employer's unfair labor practices as "pervasive." See also *NLRB v. Berger Transfer & Storage Co., supra; Altman Camera Co. v. NLRB,* 511 F.2d 319 (7th Cir.1975). The empirical study of representation elections referred to earlier supports the proposition that the Board overuses the bargaining order. See Getman, Goldberg & Herman, *supra,* at 113–16.

■ Although the union in this case had a card majority, by itself this has little significance. Workers sometimes sign union authorization cards not because they intend to vote for the union in the election but to avoid offending the person who asks them to sign, often a fellow worker, or simply to get the person off their back, since signing commits the worker to nothing (except that if enough workers sign, the employer may decide to recognize the union without an election). See *NLRB v. S.S. Logan Packing Co.,* 386 F.2d 562, 565 (4th Cir.1967); *NLRB v. Gruber's Super Market, Inc., supra,* 501 F.2d at 705; *Walgreen Co. v. NLRB, supra,* 509 F.2d at 1020, 1023 (dissenting opinion). A study referred to in the *Logan Packing* case found that even where the union had authorization cards from between 50 and 70 percent of the employees, it won only 48 percent of the elections. See 386 F.2d at 565. (The study itself gives the figure 52 percent, but this is evidently an arithmetical error, since the study reports that the union won 42 out of 87 elections, which is 48 percent. McCulloch, *A Tale of Two Cities: Or Law in Action,* Proceedings of ABA Section of Labor Relations Law 14, 17 (1962).) Another

study found that 18 percent of those signing authorization cards did not want union representation at the time they signed. See Getman, Goldberg & Herman, *supra,* at 132. Thus the fact that 28 out of 47 employees of Shenanigans signed cards over a period of almost a year does not imply that the union probably would have won the election had it not been for the unfair labor practices, but that it probably would have lost. The union's card majority was only 60 percent, and if you assume that only 82 percent of them wanted union representation at the time this means that less than half of the company's work force did.

Also, some workers apparently were led to believe that if they signed cards and the union won they would not have to pay the union's initiation fee. This would be an inducement to sign regardless of how one planned to vote. The Board pointed out that any worker could get the initiation fee forgiven by signing up after the election but before a collective bargaining contract was signed. But there is evidence that at least three of the 28 signers were unaware that they could defer signing till after the election and still avoid having to pay an initiation fee if the union won. If they had not signed, the union's card majority would have been even more precarious.

There are other reasons to doubt (and the Board did not find) that the unfair labor practices changed the outcome of the election. Any intimidating effect from firing Mrs. Griffiths should have been offset by her reinstatement two months before the election—a signal to the other workers that the company would not be allowed to retaliate against the union's supporters. See Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA,* 96 Harv.L.Rev. 1769, 1791, 1793 (1983). The no-distribution rule cannot have had much impact on the election since neither the union nor its adherents among the employees even bothered to inquire whether the rule barred leafletting during nonworking intervals, and since the leaflets could have been handed to the workers in their homes or as they came to and left

work. As for preventing the distribution of leaflets in the parking lot, we find it impossible to believe that one leaflet could have swung this election, especially since the union could and for all we know did distribute the same leaflet the next day outside the restaurant when the employees came to work or when they left. The assault against the union organizer in the presence of an employee cannot have made much difference either, when that employee was herself one of the union organizers. The assault did not diminish *her* ardor for the union. And if she had thought that knowledge of what Block had done would deter employees from voting for the union, she would not have told them what she had seen. She did tell them, which implies that she thought they might vote for the union out of a sense of outrage at Block's behavior. Finally, the late invitations to Mrs. Griffiths and Miss Tuttle—a feeble reprisal and one about which the other employees did not learn, so far as appears, till after the election—at worst prevented the two from conducting union politicking at the party. They had plenty of other opportunities to communicate with the employees in an organization campaign that stretched over the better part of a year.

█ So if the test were whether but for the unfair labor practices the union would probably have won the election, we would have to conclude that the Board had flunked the test; the union lost the election by too decisive a margin for a handful of minor incidents spaced out over many months to have made the difference. But the legal test for a bargaining order in a case where the union has lost the election is actually more stringent than this. It is whether it would be infeasible to hold a new, fair election, because of the lingering aftermath of the unfair labor practices committed in the previous campaign (see, e.g., *Standard-Coosa-Thatcher Carpet Yarn Division, Inc. v. NLRB,* 691 F.2d 1133, 1144 (4th Cir.1982)); it is whether in this case, if a new election had been held sometime after May 3, 1982 (the date of the administrative law judge's decision finding the company guilty of unfair labor practices), and the union had again lost, the reason it would have lost would have been the unfair labor practices committed in 1980 and January 1981. Any coercive effect of those practices should have dissipated within a period of more than a year from the election. We cannot believe that if a new election had been held on the basis of an order finding the company guilty of unfair labor practices the employees would have been afraid to vote—by secret ballot—for the union, because Mrs. Griffiths had been fired in April 1980 (and reinstated six months later with back pay), because she and Miss Tuttle had not been invited to the anniversary party, because the company had banned the distribution of pro-union and anti-union leaflets between November 20, 1980, and January 22, 1981, and because during the anniversary party Block had prevented the distribution of leaflets in the parking lot and in the course of doing so had shoved a union organizer (who was not an employee) to the ground.

Moreover, we may assume that even if the Board had not issued a bargaining order the company would have appealed from the Board's remedial order since it had meritorious grounds of appeal; and though there is no suggestion that the company has tried to delay these judicial review proceedings, it will be well into 1984 before a new election can be held or, alternatively, the company begins negotiations with the union pursuant to a bargaining order. It would be reckless to assume that a union that got a 60 percent card majority in 1980 and lost the election decisively in January 1981 (getting only 30 percent of the vote) will be the choice of Shenanigans' employees for collective bargaining representative in 1984. Probably there has been substantial employee turnover in three years (as many as 40 percent of Shenanigans' employees are high-school students), as well as some fading of memories, and when we consider how peripheral the unfair labor practices must have been to the protracted organization drive we are convinced that a bargaining order would be an excessive sanction.

To sum up: Enforcement of the bargaining order will be denied, but it is of course open to the Board on remand to order the election rerun. With regard to the cease and desist and notice provisions of the Board's order, we shall deny enforcement of the portion directed at the company's exclusion of Mr. Griffiths from Shenanigans (the only unfair labor practice finding that the company has successfully appealed to us), but enforce the other cease and desist and notice provisions. The Board may submit a suitable form of order for us to sign.