## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## HARRISON STEEL CASTINGS COMPANY, Respondent.

### No. 82–2866.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1983.

Decided Feb. 13, 1984.

Rehearing and Rehearing En Banc Granted April 19, 1984.\*

Catherine Garcia, N.L.R.B., Washington, D.C., for N.L.R.B.

Nora L. Macey, Segal & Macey, Indianapolis, Ind., for intervening-petitioners.

Jay Robert Larkin, Roberts, Ryder, Rogers & Neighbours, Indianapolis, Ind., for respondent.

Before BAUER and COFFEY, Circuit Judges and CELEBREZZE, Senior Circuit Judge.*

CELEBREZZE, Senior Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order against Harrison Steel Castings Company (Company) pursuant to 29 U.S.C. Sec. 160(e). The Board's order, which is reported at 262 NLRB 59 (1982), requires the company to remedy several unfair labor practices, to cease and desist from any further unfair labor practices, and to post an appropriate notice in its plant. It also requires a second representation election to be held. Although the Board found that the Company committed multiple violations of the National Labor Relations Act, 29 U.S.C. Sec. 151 *et seq.*, the Company challenges only a portion of the Board's order. Consequently, we relate only those facts which are necessary for discussion of the issues briefed by the Company.

The Company is a manufacturer of steel castings which is located in Attica, Indiana; its principal customer is Caterpillar Tractor, which purchases nearly 85 percent of the Company's output. The Company employs approximately 1,000 workers in its operations.

On March 7, 1979, the United Automobile, Aerospace and Agricultural Implement Workers of America (Union) notified the Company that the Union was attempting to organize the Company's production and maintenance employees. The Union filed a petition for a representation election with the Board on April 6, 1979, and conducted its first organizational meeting. In the month preceding the election, the Union and the Company presented actively their respective positions on unionization. The Company conducted, during working hours, several "captive audience" meetings for groups of employees. The Company also published a special election edition of the plant newsletter which detailed the Company's anti-union position. In this newsletter, the Company made the following assertions:

> If you would be called out on strike by the Union during contract negotiations, such a strike is called an economic strike and all employees not reporting to work can be permanently replaced. A company cannot fire employees for striking but it can permanently replace them. Permanent replacements hired for strikers are allowed by law to keep the striker's job even after the strike ends. Thus, employees who go on strike and are replaced have no job to return to when the strike ends.

> \*　　\*　　\*　　\*　　\*　　\*

> Some of the Harrison Steel Castings Company's competitors are non-union and some are located in the Southern part of the United States where wage rates are traditionally lower, and if we become union the Company may become non-competitive with a resulting loss of business and jobs. This loss of business could come about through increased cost of operation, not due to wage or benefit increases to employees but rather due to the inherent increased cost in operating a union plant. At union companies much time is spent on grievance processing,

---

* The Honorable Anthony J. Celebrezze, Senior Circuit Judge, U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

contract negotiations, and dealing with the Union, which add to the cost of operation, but do not put any benefits in the employee's pocket.

\* \* \* \* \* \*

In a union company there is the ever present possibility of a strike. Our customers rely upon dependable delivery of goods and services, and the risk of a strike may force our customers into looking for alternative suppliers, which could lead to a loss of jobs at our plant. When you consider your vote for or against a union examine that choice in terms of your own personal best interests rather than what is good for the employer.

In addition to presenting its views on unionization, the Company also engaged in several instances of anti-union conduct which the Board found to be illegal.[1] On two occasions, the Company prohibited employees from distributing pro-union literature in public areas near the plant; distribution of pro-union materials was also prohibited during non-work periods in non-work areas of the plant. Company foremen also interrogated and threatened pro-union employees. Employees wearing pro-union buttons were denied regularly scheduled overtime and at least one active supporter of the Union was transferred from the day shift to the night shift in retaliation for supporting the Union. This employee eventually was discharged because of her unwillingness to work the night shift.[2]

The Company also discharged three other employees: Debra Tornquist, Inez Tornquist, and Dan Watkins. The Tornquists were office employees who worked in the payroll department, and were not members of the proposed bargaining unit. On May 8,

1979, a "company appreciation" rally was conducted by employees who opposed the Union. One of the organizers, Sue Ward, canvassed the clerical employees to determine whether they planned to attend the rally. On Monday, May 7, 1979, she asked the Tornquists whether they would be attending; both Inez and Debra indicated that they would not attend because they had personal matters to attend to on Tuesday afternoon, when the rally was scheduled. The Tornquists worked the remainder of Monday morning, but did not return to work Monday afternoon. The Tornquists had informed Tom Gossett, their superior, that they would not be returning on Monday afternoon. They did not, however, inform the head of their department, Robert Blickenstaff, that they would not be returning in the afternoon. At approximately 4:30 p.m. on Monday afternoon, Blickenstaff called Inez Tornquist and indicated that she and Debra had been discharged.[3]

Dan Watkins was employed by Harrison Steel as an electrician. Watkins was one of the leaders of the Union organizing effort, was a Union observer at the representation election,[4] and was involved in filing objections to the election with the Board. Watkins worked on the 11:00 p.m. to 7:00 a.m. shift as a maintenance man. He was responsible for repairing any equipment breakdowns; according to Watkins' foreman, Watkins and his co-worker, Grant Campbell, were free to leave the maintenance work area, if no breakdowns occurred, so long as they informed someone where they could be contacted.

On September 17, 1979, Watkins arrived for work at approximately 9:30 p.m.[5] On

1. Because the Company does not challenge the Board's findings in this regard, these instances of apparent misconduct must be considered to have actually occurred as the Board found.

2. The Board found that this discharge was the result of the employee's pro-union conduct and, thus, an unfair labor practice. The Company does not contest this finding.

3. The substance of this conversation was hotly disputed before the Board. See text accompanying note 7, infra.

4. Apparently, Watkins had doubts regarding his decision to support the union; he expressed those doubts to the Company's management on at least one occasion. See text accompanying notes 8–9, infra.

5. Watkins and Grant Campbell regularly arrived early for their shift in order to receive overtime pay. Thus, the Company does not assert that Watkins was discharged because he improperly clocked in early.

his way into the plant, he stopped to speak with the plant guard, Lillian Sexton. According to the credited testimony, Watkins punched his timecard at 9:42 p.m., when he saw his co-worker Campbell arrive. Within minutes, he also punched a card for Campbell and gave it to Campbell as he passed by the guardhouse. Watkins testified that he informed Campbell that he was available for work and could be contacted at the guardhouse if equipment repairs were necessary. Watkins apparently left the guardhouse at about 10:30 p.m.; he and Campbell were not needed for repairs until approximately 11:00 p.m.

Watkins was ill for several days, and did not report for work again until September 20, 1979. At the end of his shift, he was called into the office of the company president, Kenneth Freed; at that meeting, Watkins admitted that he had clocked in at the guardhouse rather than the maintenance department and that he had stayed at the guardhouse and talked with the guard for nearly an hour after he had punched his card. Later that day, Watkins was discharged.

The Union lost the election by a vote of 418 to 390. The Union filed objections to the conduct of the election, as well as several unfair labor practice charges. The Board's administrative law judge found that the Company was guilty of several unfair labor practices; specifically, it found that the statements made by the Company concerning the effects of unionization were unduly coercive, that the discharges of the Tornquists were the result of their refusal to attend the pro-company rally, and that the discharge of Watkins was the result of

his pro-union activities. The Board accepted these conclusions, although it rejected the ALJ's rationale for finding the Company's public statements to be unduly coercive. The Company does not challenge, in this court, the remainder of the Board's order; it only challenges the Board's conclusions that the discharges of the Tornquists and Watkins and the Company statements regarding the effects of unionization were unfair labor practices.

██ A company violates Sec. 8(a)(1) and Sec. 8(a)(3) when it discharges an employee for engaging in activity protected by Sec. 7 of the Act. *E.g., NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 691 (7th Cir.1982) ("The critical issue in a Sec. 8(a)(3) claim is whether the employer's actions are motivated by anti-union considerations."); *Justak Brothers and Co. Inc. v. NLRB,* 664 F.2d 1074 (7th Cir.1981). In this case, the Board found that the Tornquists' refusal to attend a pro-company rally [6] and Watkins' pro-union activity were substantial motivating factors in the Company's discharge decisions. Consequently, the Board concluded that the Company violated Sec. 8(a)(1) and Sec. 8(a)(3) by discharging Inez Tornquist, Debra Tornquist, and Dan Watkins. We must enforce the Board's order if its findings are supported by substantial evidence on the record as a whole.[7] *E.g., NLRB v. Adam & Eve Cosmetics, Inc.,* 567 F.2d 723 (7th Cir.1977).

██ In our view, substantial evidence supports the Board's finding that the Tornquists' refusal to attend the pro-company rally was a substantial motivating factor in the Company's discharge decision. Inez

---

**6.** The Company argues that the Tornquists are not entitled to the Act's protection in this instance because they did not engage in protected activity. We disagree. Although the Tornquists are not employees within the appropriate bargaining unit, and may not have intended to support the Union, they are entitled to the Act's protection; an employer cannot lawfully discharge any employee because the employer believes, even mistakenly, that the employee has decided to either support or refrain from supporting the union's cause. Such action is designed to coerce employees into taking either a pro-union or anti-union stand and, thus, is a

violation of the Act. *See NLRB v. Gold Standard Enterprises, Inc.,* 679 F.2d 673 (7th Cir. 1982).

**7.** The Company asserts that the Board improperly allocated the burden of proof with regard to the Company's alleged discriminatory discharges. The Company's argument in this regard has been recently considered and expressly rejected by the Supreme Court. *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

Tornquist testified that Robert Blickenstaff, the Company's Office Manager, telephoned her and stated:

> "... I hate to be the one to have to tell you this, but you and Debbie have been separated.... Freed and Rusty Harrison, the Company's Secretary-Treasurer, did not see your names on the list to attend the Company rally and Freed did not like it ... and he ordered me to call you and tell you that you'd been fired and said (sic) you had poor attitudes because you didn't support the Company and attend the Rally."

Blickenstaff admitted that he telephoned Inez Tornquist and informed her of the Company's discharge decision, but denied having made any statement concerning the Tornquists' refusal to attend the pro-company rally. The administrative law judge credited Inez Tornquist's testimony. Clearly, if Inez Tornquist's testimony was properly credited, then substantial evidence supports the Board's finding that the Tornquists' refusal to attend the pro-company rally was a substantial motivating factor in the Company's discharge decision.[8] After reviewing the record, we believe that the Board properly credited Inez Tornquist's testimony,[9] and thus, we believe that the Board correctly concluded that the Company violated Sec. 8(a)(1) and Sec. 8(a)(3) by discharging the Tornquists.

■ We also believe that substantial evidence supports the Board's finding that Dan Watkins' pro-union activity was a substantial motivating factor in the Company's decision to discharge him. From the start of the Union's organizing campaign, Watkins was the most visible Union supporter: he solicited Union authorization cards, distributed Union literature, attended union meetings, and often discussed the merit of union representation with his supervisors. In late April, Watkins arranged a meeting with Company President Freed to inform Freed that he and other employees had become disenchanted with the Union and to elicit the Company's views about the coming election. A few days later, however, Watkins apparently experienced another "change in heart" and accepted a position as a member on a Union organizing committee. Thereafter, Watkins remained a pro-union supporter; he served as a Union observer for the May 10th election and his name appeared on several election objections filed by the Union.

Before the Board, the Company argued that Watkins was discharged because he punched the wrong time clock at 9:42 p.m. on September 17th and because he allegedly failed to inform the appropriate supervisor of his whereabouts until 10:30 p.m. According to the Company, this misconduct amounted to "cheating" and "dishonesty". The Board, however, found that these reasons for discharging Watkins were pretextual and that Watkins was discharged because he betrayed the Company by supporting the Union. We believe that sufficient circumstantial evidence supports the Board's findings in this regard. The testimony of foreman Jones supports the Board's finding that Watkins' misconduct was no more than a minor and technical departure from shop rules.[10] Further, Wat-

8. The Company argued that it was not aware of the Tornquists' intention not to attend the pro-company rally until after they were discharged. The testimony credited by the Board, however, supports its conclusion that Ward, an office receptionist, informed Blickenstaff on May 7, 1979 of the Tornquists' intention not to attend the rally.

9. The Board's reason for accepting Inez Tornquist's testimony was based, in part, on its belief that the testimony of the Company's witnesses was incredible. A reviewing court must accept the Board's credibility findings unless the party challenging the credibility determination establishes "exceptional circumstances."

E.g. *Medline Industries, Inc. v. NLRB,* 593 F.2d 788, 795 (7th Cir.1979) ("We do not overturn findings based on credibility determinations because, 'absent exceptional circumstances, credibility resolutions are within the province of the trier of fact.'"), quoting *Electri-Flex Co. v. NLRB,* 570 F.2d 1327, 1331–32 (7th Cir.), *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). The Company points to no exceptional circumstances in this instance, and, thus, we accept the Board's decision to credit Inez Tornquist's testimony.

10. *See* text accompanying note 5, *supra.*

kins testified that Freed referred to Watkins' pro-union activities during the pre-discharge meeting: Freed was upset because Watkins had breached a prior understanding that he would not actively campaign for the Union.[11] We believe that the relatively minor nature of Watkins' misconduct, Freed's dismay with Watkins' pro-union activities and the Company's general anti-union animus[12] all support the Board's conclusion that the Company violated Sec. 8(a)(1) and Sec. 8(a)(3) by discharging Watkins.

■ Next, we consider the lawfulness of the three written statements made by the Company prior to the May 10th election.[13] Section 8(a)(1) of the Act prohibits an employer from making statements that "interfere with, restrain, or coerce" its employees' right to engage in protected activity. An employer, therefore, violates the Act when he threatens to punish employees for engaging in protected activity. *E.g., NLRB v. Berger Transfer & Storage Company*, 678 F.2d 679, 690 (7th Cir.1982); *NLRB v. Lucy Ellen Candy Division of F. & F. Laboratories, Inc.*, 517 F.2d 551 (7th Cir.1975). When, however, an employer's pre-election predictions regarding matters beyond the employer's control have a substantial factual basis, they contain "no threat of reprisal or force or promise of benefits" and are protected by Sec. 8(c) of the Act. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). "The Board has the primary responsibility for determining whether statements are to be construed as threats or mere expressions of opinion" and the Board's decision in this regard will not be disturbed on appeal if "the record as a whole reveals substantial evidence in support of the finding." *NLRB v. Lucy Ellen Candy Div. of F. & F. Lab., Inc.*, 517 F.2d 551, 537 (7th Cir.1975). Consistent with this authority, we review the Board's conclusion that each of the Company's statements were a violation of Sec. 8(a)(1) of the Act.

The first employer statement at issue concerns the replacement of economic strikers. Essentially, the Company stated that it could not discharge employees for striking, but that employees who participate in an economic strike may be "permanently replaced" and that replaced strikers "have no job to return to when the strike ends." The administrative law judge drew a distinction, apparently adopted by the Board, between the Company's statement that strikers could be "permanently replaced" and the Company's statement that replaced strikers "have no job to return to when the strike ends." According to the Board, an employer may lawfully inform its employ-

---

11. The Board chose to credit Watkins' testimony in this regard because it was corroborated, in part, by Freed. Freed testified that he felt "conned" because Watkins decided to support the Union two days after Watkins had informed Freed that he and other employees would not support the Union. Again, the Company has failed to establish "exceptional circumstances" which would justify discounting the Board's credibility determination. *See* note 8, *supra*.

12. The Board properly considered the wide variety of unfair labor practices that the Company had engaged in as some evidence that Watkins' pro-union activity was a substantial motivating factor in the Company's discharge decision. *See NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 692 (7th Cir.1982).

13. By letter dated May 1, 1979, the Company also made the following statements:
"We have heard some talk about strikes where there is a union in a plant. Everyone who reads the papers knows that unions frequently have strikes. The purpose of a strike is to cause production to stop with the result that employees get no paychecks and the customers get no shipments or products. You know that on many of the things we ship to Caterpillar we are Caterpillar's sole source for the casting. Obviously, if a union struck Harrison Steel, our relationship with Caterpillar would suffer. No customer is going to stand by and continue to give exclusive source orders to a supplier who has strikes. You should give thought to the likelihood of a strike if a union gets in. You should also give thought to the effect of a strike upon our relationship with Caterpillar. If we lost Caterpillar business because we were an unreliable source of supply, employees would lose jobs and the Company and the whole community would suffer."
Because these statements paraphrase the employer's third statement, we need not consider this letter separately.

ees that during an economic strike the Company has an "absolute right to permanently replace each and every striker", *Care Inn, Collierville,* 202 NLRB 1065 (1973), but an employer may not state that permanently replaced employees "have no job to return to when the strike ends" unless it also provides the employees with a full explanation of the rights of a permanently replaced employee. We need not express an opinion regarding the merit of this distinction. Instead, we need only decide whether the Company's statement that "employees who go on strike and are replaced have no job to return to when the strike ends" was unduly coercive in light of the facts and circumstances of this case.

■ In determining whether an employer's statement is unduly coercive, the Board must evaluate the speaker's intent and the listener's understanding. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 619, 89 S.Ct. 1918, 1942–1943, 23 L.Ed.2d 547 (1969). Thus, an employer's statement cannot be viewed in isolation; it must be considered in conjunction with those factors which might affect reasonably the listener's perception. The same statement may be lawful in one context and unlawful in another. *See Corrie Corp. of Charleston v. NLRB,* 375 F.2d 149, 153 (4th Cir.1967) ("The difference between permitted and coercive language often lies in an analysis of the 'total background of facts and circumstances.' "). In this instance, the Company's statement that "employees who go on strike and are replaced have no job to return to when the strike ends" must be considered in the context of an organizational campaign replete with unfair labor practices: the Board determined that the Company pro-

hibited illegally the distribution of pro-union literature in public areas near the plant and that the Company prohibited illegally the distribution of pro-union literature during non-work periods in non-work areas of the plant. Furthermore, the Board found that the Company discriminatorily punished three Union adherents, discriminatorily discharged four employees, and coercively threatened, by interrogation and by groundless statements of job loss, a number of other employees. The majority of these unfair labor practices occurred prior to the May 10th election. In light of the Company's evident anti-union animus, we believe that the employees could have interpreted reasonably the Company's statement as an implied threat of discharge.[14] *See, e.g., NLRB v. Gold Standard Enterprises, Inc.,* 679 F.2d 673, 676 (7th Cir.1982) ("An employer's statements violate Sec. 8(a)(1) not only when they actually produce a coercive effect, but also when they have the tendency to do so."); *Jay's Foods Inc. v. NLRB,* 573 F.2d 438, 444 (7th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) (In determining coercive effect, courts must consider the position of the economically-dependent employees.). Because substantial evidence supports the Board's finding that the employees could have interpreted reasonably the Company's statement as an implied threat of discharge, we believe that the Board concluded properly that the Company's statement was a violation of Sec. 8(a)(1) of the Act.

■ The two remaining employer statements in dispute concern the Company's predictions of job loss. Generally, Sec. 8(c), 29 U.S.C. Sec. 158(c) permits an employer to inform his employees of the advantages and

---

14. The dissent challenges the Board's conclusion that the Company's statement that "employees who go on strike and are replaced have no job to return to when the strike ends" violates Sec. 8(a)(1) of the Act. According to the dissent, no *reasonable* employee would have interpreted the Company's statement as an implied threat of discharge because the Company stated expressly: "A company cannot fire employees for striking but it can permanently replace them." We agree with the dissent that employees are capable generally of assessing

misleading campaign propaganda. We doubt seriously, however, that most employees are aware of the legal distinction between "discharge" and "permanent replacement". In our view, employee confusion is the likely result of these statements; the prudent employee, knowing that the Company punishes consistently other employees for their union sentiments, would resolve any ambiguity by discounting the Company's statement that it would not discharge economic strikers.

disadvantages of union representation. Because a statement concerning job loss tends to discourage concerted activity, however, courts have construed narrowly an employer's section 8(c) rights in this context. *See e.g., NLRB v. Gissel Packing Co.,* 395 U.S. 575, 579, 618, 89 S.Ct. 1918, 1922, 1942, 23 L.Ed.2d 547 (1969). Thus, an employer may not predict that unionization may result in a loss of jobs unless the prediction is "carefully phrased on the basis of objective fact." *Id.* The employer bears the burden of proving that his predictions of job loss have a substantial factual basis. *Id.; Zim's v. Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1137 (7th Cir.1974). In this instance, the Board found that the objective evidence offered by the Company failed to support its predictions of job loss and concluded that the employer violated Sec. 8(a)(1) by making two job loss predictions.

■ In the Company's first job loss statement, it asserted that unionization would increase its labor costs. From this premise, the Company reasoned that an increase in labor costs and the attendant price increases would affect adversely its competitive market position which, in turn, would result in a loss of jobs. We agree with the Board that the Company had established a "realistic foundation" to support its premise, by identifying additional labor costs which might reasonably increase its overall operating expenses. The Company, however, failed to demonstrate the causal connection between a projected increase in labor costs and a loss of jobs. The evidence indicates that the Company was profitable, that it operated at more than full capacity, and that its employees regularly worked overtime hours. The reasonable inference which can be drawn from these facts is that only a substantial increase in operating costs would affect the Company's competitive position. The Company, however, failed to produce objective evidence that any increase in labor costs would affect materially the Company's competitive position. Moreover, the Company failed to introduce evidence to support its assertion that a change in its competitive position would affect adversely its labor force. The question is not whether unionization would affect adversely the Company's labor costs and prices; rather, the question is whether incremental additional costs would result in a worsened competitive position and, consequently, in a loss of jobs. Because the Company failed to produce evidence explaining the connection between increased labor costs and job loss, we believe that substantial evidence supports the Board's conclusion that the Company failed to establish a sufficient factual basis for its job loss prediction.[15]

---

15. The dissent relies on *NLRB v. Intertherm, Inc.,* 596 F.2d 267 (8th Cir.1979). In *Intertherm,* the challenged pre-election statements were as follows:

"I have dealt with a number of unions in which I have had to shut down plants, or move them elsewhere. I've sat at the bargaining table and told an international union that you'll either have to agree with the company's position or we'll shut the plant down. These are not threats, these are simply facts showing what I think all of you really understand." *Id.* at 277–78.

The court held that the employer "was careful to state that his remarks were not threats but simply his view of the *possible* economic consequences of a union victory." *Id.* at 278 (emphasis added). The dissent argues that "the remarks of Harrison's management were more restrained and reasoned as well as milder in tone, and had a stronger economic foundation than the statements approved ... in *Intertherm.*" We believe that the Eighth Circuit's holding in *Intertherm* is, at least in part, inconsistent with the Supreme Court's decision in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 579, 89 S.Ct. 1918, 1922, 23 L.Ed.2d 547 (1969).

In our view, a company may not prohibit illegally the distribution of pro-union literature, interrogate and threaten illegally pro-union employees, deny illegally regularly scheduled overtime hours to employees wearing pro-union buttons, punish illegally employees for their pro-union sentiments, discharge illegally employees for exercising rights guaranteed by federal law and speculate as to the "possible" loss of jobs which *may* result from unionization. Accordingly, although a number of the Company's predictions were framed as possible consequences of unionization, we agree with the Board that a Company's statement that jobs "might" be lost or that it "might" close the plant down does not lessen the statements' coercive potential. *See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 579, 619–20, 89 S.Ct. 1918, 1922, 1942, 1943, 23 L.Ed.2d 547 (1969) (Wherein the Supreme Court recognized that

The Company's second job loss statement was similarly defective; the Company offered objective evidence that unionization would result in a decrease in its sales to Caterpillar, its primary customer, but it failed to establish the necessary causal connection between the projected loss of business and *a loss of jobs.* The evidence supports the conclusion that unionization would affect the Company's relationship with Caterpillar; if the Company became a union company, then Caterpillar's union-supplier policy would not permit the Company to run Caterpillar's patterns on an exclusive basis.[16] Thus, unionization would mean that the Company would lose some business. Caterpillar would place some duplicate patterns with another union-supplier who would be entitled to approximately 10–25% of Caterpillar's total production requirement for that pattern.[17] We believe that this evidence establishes a substantial factual basis for the Company's prediction that

unionization would result in the loss of business. A decrease in the amount of the Company's production devoted to Caterpillar, however, does not mean that unionization would result necessarily in a loss of jobs. The Company failed to establish whether the production loss contemplated here would necessitate layoffs.

In summary, the absence of such evidence coupled with the Company's evident anti-union animus is sufficient to support the Board's conclusion that the Company's predictions of job loss were not innocent statements based on objective fact, but rather, implied threats which had a tendency of coercing employees to vote against the union.[18] Accordingly, we hold that the Board's challenged findings are supported by substantial evidence.[19] The Board's order is enforced.

ENTERED BY ORDER OF THE COURT

employees are "particularly sensitive" to employers' statements of job loss); *Jay's Foods, Inc. v. NLRB,* 673 F.2d 438, 444 (7th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) (In determining coercive effect, courts must consider the position of the economically dependent employees.). *But see,* J. Getman, S. Goldberg & J. Herman, *Union Representation Elections: Law and Reality,* (1981). (employers' statements have little influence on employees).

**16.** Caterpillar owns the patterns and issues these patterns to its suppliers. Approximately two-thirds of the patterns that the Company runs for Caterpillar are exclusive.

**17.** Evidence also established that, as a result of unionization, Caterpillar would require that the Company stockpile three months worth of orders during the six month period prior to the expiration of any collective bargaining agreement. Apparently, the Company assumes that a loss of jobs would result because the stockpiling requirement would place the Company three months ahead of their normal production schedule. Testimony indicates that the vast majority of Caterpillar's union-suppliers have three-year collective bargaining agreements. We do not believe that a Company can base a job loss prediction on a three year estimate of its future labor demand. Such evidence is far too speculative to establish a substantial factual basis for the Company's job loss prediction.

**18.** This court's recent decision in *NLRB v. Village IX, Inc., d/b/a Shenanigans,* 723 F.2d 1360

(7th Cir.1983) does not require a contrary result. In *Shenanigans,* particular emphasis was placed on evidence concerning the unique and highly competitive nature of the restaurant business in Decatur, Illinois. Indeed, this court relied specifically on the Company's evidence that "only one restaurant in Decatur was unionized and it was doing badly." *Id.* Although we express no opinion regarding the advisability of an analysis based on the success rate of "union" companies, the evidence in this case establishes clearly that the vast majority of the Company's competitors were unionized. Further, the Company failed to prove that "union" competitors were unable to compete effectively.

**19.** We share the dissent's concern that "excessive union demands, along with other factors, has not only caused many firms in the midwest to lose business to foreign and 'sun-belt' competitors, but also to shut down and lose plants to states located in the 'sun-belt' region", and its concern that "[m]illions of dollars of business has been lost annually to foreign markets in part due to labor costs." A federal court, however, should not broaden an employer's free speech rights pursuant to Sec. 8(c) based upon its independent evaluation of the economic climate in the northern part of the United States. It must enforce the Board's findings when supported by substantial evidence. *E.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Mosey Manufacturing Company, Inc. v. NLRB,* 701 F.2d 610 (7th Cir.1983).

COFFEY, Circuit Judge, dissenting in part.

I respectfully dissent from that portion of the majority opinion which supports the Board's determination that statements made by Harrison Steel's management prior to the representation election violated § 8(a)(1) of the Act as constituting "threats" prohibited by the Act. I would hold that the statements were not threats because they were consistent with an employer's right to freedom of speech.

The Board first objects to the statement made by Harrison Steel's management in the company newspaper's "election special." The article read in part:

"If you would be called out on strike by the union during contract negotiations, such a strike is called an 'economic' strike and all employees not reporting for work can be PERMANENTLY REPLACED. A company cannot fire employees for striking but it can 'permanently replace' them. Permanent replacements hired for strikers are allowed by law to keep the striker's job even after the strike ends. Thus, employees who go on strike and are replaced have no job to return to when the strike ends."

The Board asserts that an employer cannot state that replaced strikers "have no job to return to when the strike ends." Somehow, through speculative and novel reasoning they believe that the employees may have interpreted this statement as an implied threat of discharge for engaging in protected activity. I fail to see how the Board, through the process of logical reasoning, can reach this conclusion as the employer took great care in prefacing this allegedly illegal statement with an unequivocal assurance that "a company cannot fire employees for striking." The Board seems to have made up its mind as to how the case should be decided and to achieve their desired result took part of the statement out of context, and thereby cast aside the real import and intent of the statements in their entirety. Reading the statements in their entirety, I fail to understand the thought process the Board undertook that allowed it to con-

clude that an employee could interpret the employer's statements as an improper threat of job termination thus inhibiting employee free choice. The Board would evidently mandate that each and every employer would have to explain in minute detail the procedures through which workers, once permanently replaced, must be rehired as vacancies occur if they still desire employment after the strike. The Board imaginatively reasons that because the employer failed to give this explicit, thorough explanation, the message was "subject to an interpretation of final job elimination without resurrection as vacancies occur during the post-strike period." Even though they have taken one sentence out of context to achieve their desired end, any such interpretation would be strained to say the least considering that the employer specifically stated that "[a] company cannot fire employees for striking but it can 'permanently replace' them."

I do not agree with the Board's implication that the Act requires an employer to explain each and every technical point of labor law to its employees, particularly when no reasonable person could conclude that they would lose all rights to their jobs. The Board has recently ruled that employees are realistically able to assess misleading campaign propaganda and that it will not set aside representation elections based upon misleading campaign statements. *Midland National Life Insurance Co.,* 263 NLRB 127 (1982). The Board recognizes "employees 'as mature individuals who are capable of recognizing campaign propaganda [i.e., puffing and exaggerations] for what it is and discounting it.'" *Id.* at 130 (quoting *Shopping Kart Food Market, Inc.,* 228 NLRB 1311, 1313 (1977)). In *Midland Life,* the Board stated that its decision "removes impediments to free speech by permitting parties to speak without fear that inadvertant errors will provide the basis for endless delay or overturned elections ...." *Id.* at 132. While the case before us does not deal with campaign propaganda, the *Midland Life* holding should have equal or greater application in a case such as this when the statements made by management

personnel could not be considered to be misleading. *See, Excessive Restriction on Employers' Predictions During Union Representation Campaigns,* 66 Marq.L.Rev. 785, 812–15 (1983). Harrison's employees were "realistically able to assess" the statements made. No reasonable employee would have taken the final sentence out of context, as the Board did in an attempt to achieve their desired result, and concluded that they would be fired without opportunity for re-employment at a later date.

In any event, the employer's statement that employees who are "replaced have no job to return to when the strike ends" is a literally true and factually correct statement. If the employer does in fact hire replacements during the strike, those strikers whose jobs were filled by replacements would not have jobs to return to *when the strike ended* absent other vacancies. True, at some point in the future when and if vacancies occur, they would have a job to return to, but not immediately upon the termination of the labor walkout.

Furthermore, this case is readily distinguishable from Board decisions which found employer statements objectionable when employees were told that they would "permanently lose" their jobs without being advised, as Harrison's employees were, that "a company cannot fire employees for striking." *See, e.g., Webel Feed Mills & Pike Transit Co.,* 217 NLRB 815 (1975); *Hicks-Ponder Co.,* 186 NLRB 712 (1970), *enf'd,* 458 F.2d 19 (5th Cir.1972). Such threats are clearly objectionable and violate the Act in contrast to the facts in this case where employees were specifically told they could not be fired for striking and the employer truthfully and accurately informed them that if the company exercised its right to hire replacements the striking employees would not have a job to return to when the strike ended. The Board has recently ruled that a company may inform its employees that permanent replacements can be hired to fill their jobs and that there is no need to fully detail their re-employment rights. *Eagle Comtronics, Inc.,* 263 NLRB 515 (1982). The Board reasoned that "[t]o hold otherwise would place an unwarranted bur-den on an employer to explicate all of the possible consequences of being an economic striker." *Id.* at 516. Similarly, in this instance, an unwarranted burden is imposed upon employers because contrary to the Board's novel interpretation, there was no threat of job loss since the employees were unequivocally told they could not be fired for striking. In *N.L.R.B. v. Eastern Smelting & Refining Corp.,* an employer told employees that "a strike occurred" in the past and that as a result "employees lost their jobs." 598 F.2d 666, 672 (1st Cir.1979). The court ruled that the employer's "failure to state the full sequence, *viz.,* that some employees had been replaced and not recalled, and its summary form that they had lost the jobs [was] not significant, . . . the test is the 'total effect.'" *Id.* at 672 (citations omitted). The "total effect" of Harrison's statements here do not convey a meaning logically or realistically consistent with a conclusion that the statements were "subject to an interpretation of final job elimination." Since the Board has held that employers need not "explicate all of the possible consequences of being an economic striker," *Eagle Comtronics, Inc.,* 263 NLRB at 516, I cannot understand why the Board found Harrison's remarks objectionable. Therefore, I would hold that the employer's statements in this regard were permissible.

Two additional statements made by Harrison Steel's management to the effect that as a result of unionization some jobs might be lost were also found illegal by the Board. In the first statement, the company asserted that unionization would increase their overall costs and therefore decrease their competitiveness which could ultimately result in a loss of jobs. The "election special" of the company newspaper stated:

"Some of Harrison Steel Castings Company's competitors are non-union and some are located in the Southern part of the United States where wage rates are traditionally lower, and if we become union the company may become non-competitive with a resulting loss of business and jobs. This loss of business could come about through increased cost of op-

eration, not due to wage or benefit increases to employees, but rather due to the inherent increased cost in operating a union plant. At union companies much time is spent on grievance processing, contract negotiations, and dealing with the union, which add to the cost of operation, but do not put any benefits in the employee's pocket."

While the majority agrees with the Board that the company established a realistic foundation to support their premise, they nevertheless find these statements illegal because the company failed to demonstrate a causal connection between a projected increase in labor costs and a possible loss of some jobs. The majority believes that *N.L. R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) requires that a company must establish a factual basis sufficient to show its predictions were "likely" to occur. There the court held that an employer could make a prediction if it was "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control ...." *Id.* at 618, 89 S.Ct. at 1942. While I agree that the employer did not produce a balance sheet certified by a "big eight" CPA firm, what the employer did in this case is precisely what *Gissel* permits. It is being faulted for not showing that its projected increased costs would be substantial enough to result in employees losing jobs. It is uncontroverted that the employer "reasonably believed" some jobs would be lost. Based on a common sense review of the questioned statement, I conclude that the majority's position is an unwarranted and unduly strict interpretation of *Gissel*. Contrary to the majority's position *Gissel* did not mandate the degree of certainty that an employer must demonstrate before making a prediction based on "probable consequences." *See e.g.,* Williams, *Distinguishing Protected from Unprotected Campaign Speech,* 1982 Labor Law J. 265, 266.

*Gissel* dealt with a clear and unequivocal threat to close a plant which is a far more drastic and serious consequence than the possible loss of a few jobs. The message conveyed in *Gissel* "was not to predict that unionization would inevitably cause the plant to close but to threaten the employees ... regardless of the economic realities." 395 U.S. at 619, 89 S.Ct. at 1943. To the contrary, in this case it is those very economic realities, *i.e.,* increased labor costs as a result of unionization due to factors such as more holiday pay and a higher wage scale, and the greater costs inherent in operating a union plant, which the majority concedes Harrison realistically established, that formed the basis for the statements objected to.

*Gissel* also held that the First Amendment does not protect employer speech "[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him ...."

395 U.S. at 618, 89 S.Ct. at 1942. *Gissel* cautioned that in circumstances such as this the least an employer could do would be to "avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees." 395 U.S. at 620, 89 S.Ct. at 1943. The record in this case falls far short of substantiating a conclusion that the statements referred to here could be viewed as "conscious overstatements" intended to mislead Harrison Steel employees or that Harrison would take action solely on its own "initiative for reasons unrelated to economic necessities." In *N.L.R.B. v. Intertherm, Inc.,* 596 F.2d 267 (8th Cir.1979), an employer's remarks that evinced a fervent anti-union stance and raised the specter of plant shutdown were found not to be an unfair labor practice. The employer told his workers that "I have dealt with a number of unions in which I have had to shut down plants, or move them elsewhere. I've sat at the bargaining table and told an international union that you'll either have to agree with the company's position or we'll shut the plant down. These are not threats, these are simply facts showing what I think all of you really understand." *Id.* at 277–78. The court ruled that the remarks did not imply

"that the company would shut down its plants on its 'own initiative for reasons unrelated to economic necessities ....'" *Id.* at 278 (*quoting N.L.R.B. v. Gissel Packing Co.,* 395 U.S. at 618, 89 S.Ct. at 1942). I believe it is eminently clear that the remarks of Harrison's management were more restrained and reasoned as well as milder in tone, and had a stronger economic foundation than the statements approved in *Intertherm.*

Our court's application of *Gissel* in *N.L. R.B. v. Berger Transfer & Storage Co.,* 678 F.2d 679 (7th Cir.1982), involved factually dissimilar circumstances. In that case the employer threatened job loss and plant shutdown without articulating "any objective facts." *Id.* at 690. *See also, N.L.R.B. v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 623 (7th Cir.1981); *Zim's Foodliner, Inc. v. N.L.R.B.,* 495 F.2d 1131, 1137 (7th Cir.1974). I find it very troubling that the objective facts known to Harrison and the possible consequences of those facts should not have been shared with its employees. In my opinion, the employer would be less than honest with his employees if he did not share the information with them. Are we not witnessing an increased tendency on the part of employers to undertake accurate explanations of the economic realities during negotiations with their employees as a result of the yearly loss of billions of dollars in Gross National Product to cut-throat foreign competition? Requiring employers to make almost perfect and precise estimates of such economic consequences and only allowing them to inform employees of those facts if they are "likely" (*i.e.,* greater than 50% chance) to occur is not only unrealistic but impractical. Such estimates are incapable of being made with absolute precision unless a detailed econometric study is conducted and it is common knowledge that excessive union demands, along with other factors, has not only caused many firms in the mid-west to lose business to foreign and "sun-belt" competitors, but also to shut down and lose plants to states located in the "sun-belt" region.[1] I believe that a "realistic foundation" is sufficient, under the circumstances, to allow a company to present the possible consequences of unionization, both pro and con, to its workers. Contrary to the majority's conclusion, I further believe that there is no need for an employer to present "balance sheet" quality evidence that additional costs will result in a worsened competitive position as that conclusion is more than patently obvious. In the present case, the employer's prediction of job loss due to a worsened competitive position was truthful since it was a realistic and foreseeable consequence of the increased wages and costs associated with operating the union plant.

Our court recently recognized the uncertainty prevailing in the area of permitted and forbidden employer predictions regarding the consequences of unionization on future employment, and refused to enforce a board order which ruled that a small employer committed an unfair labor practice when it made pre-election predictions about the adverse consequences of such unionization. *N.L.R.B. v. Village IX, Inc., d/b/a Shenanigans,* 723 F.2d 1360 (7th Cir.1983). In that case the court stated that it did "not read *Gissel* to require [an] employer to develop detailed advanced substantiation ... for predictions founded on common sense and general experience." *Id.* at 1368. The majority, in footnote 18, attempts to distinguish *N.L.R.B. v. Village IX, Inc. d/b/a Shenanigans* by stating that "[i]n *Shenanigans,* particular emphasis was placed on evidence concerning the unique and highly competitive nature of the restaurant business in Decatur, Illinois. Indeed, this court relied specifically on the Company's evidence that 'only one restaurant in Decatur was unionized and it was doing badly.' *Id.*"

---

1. *See, e.g.,* Alexander Grant & Co., *General Manufacturing Business Climates,* (1982). This study, prepared by a major CPA firm, notes that the Great Lakes Region, which includes the three states of this circuit, is ranked last in terms of "business climate" among the eight major regions of the United States. Among the relevant factors which the study considered were wages, unionization and change in unionization. Indiana, Illinois and Wisconsin all rank in the bottom fourth nationally with respect to the wage and unionization factors.

The majority fails to point out, however, that the employer's statements regarding the consequences of unionization had no greater support in objective fact (the key to the analysis of the propriety of employer prediction) than in the present case. In *Shenanigans,* the employer essentially stated that he could not afford to pay union wages without any reference to balance sheets or other type of objective analysis, yet the court found that the objective support for this statement was sufficient since the prediction was based on "common sense and general experience." *Shenanigans,* at 1368. In the present case, Harrison stated that the increased costs of a union shop could result in the company becoming non-competitive with a thereby resulting loss of jobs. Again a common sense statement which is discernible from nothing more than general experience. The preceding comparison between *Shenanigans* and the present case should make it apparent that *Shenanigans* is not distinguishable. The key was the objective support for the employer's statements, not the competitiveness or unionization of the market in which they operated.

The last statements made by Harrison to which the Board took exception involve Harrison's expected loss of business and jobs caused by a changed relationship with its major customer, Caterpillar. While the majority concedes that the company presented sufficient evidence to establish a substantial factual basis for Harrison's prediction that unionization would result in a loss of Caterpillar business, they conclude that this decrease in Caterpillar business will not necessarily mean that job loss would occur. I disagree after reviewing the evidence presented.

A Caterpillar executive testified before the administrative law judge that Harrison supplied 25% of its steel casting requirements and that Caterpillar business was the "lifeblood" of Harrison's operations. Harrison produced between 140 and 150 casting patterns for Caterpillar which amounted to 85% of Harrison's total production. 116 of those patterns were "exclusive" patterns of which Harrison was the only Caterpillar supplier. The uncontroverted testimony indicated that if Harrison became unionized, Caterpillar would place a "good many" of these exclusive patterns with other suppliers so that it could be assured of a source of supply in the event of a strike at Harrison. The testimony also indicated that Caterpillar would then give those alternate suppliers between 10 and 25% of the normal production business related to those patterns in order to protect their future supply needs. As a result, Harrison stood to lose a significant portion of its Caterpillar, and thus total, business. Anyone with rudimentary knowledge of economics would safely conclude that given such circumstances job loss is not only likely but imminent. Employment is inextricably tied to the success of the employing company. Caterpillar, Harrison's key customer, informed Harrison how they would cut back Harrison's business in order to protect themselves from a shutdown of Harrison's plant. Harrison's statements in this regard did not violate the Act since they were "economic consequences reasonably foreseeable as a result of predictable responses of [a] key customer[ ]." *Patsy Bee, Inc. v. N.L.R.B.,* 654 F.2d 515, 516–17 (8th Cir.1981).

I believe that this alone is sufficient to compel a conclusion that Harrison's statements were in fact not threats, but accurate information based on reliable facts. Furthermore, requiring any greater degree of precision regarding specific job loss would place next to an impossible burden on the employer. Labor costs are but one variable of the cost of doing business and it is a well known fact that economic predictions do not of themselves lend to mathematical certainty. As Harrison points out it was in the best position to evaluate the effects of the objective evidence. Not allowing Harrison to inform its employees of such possible consequences is not only a disservice to the employees but a lack of sincerity and truthfulness. I am certain they would prefer to hear all of the possible consequences before voting in a vacuum rather than as they are handed layoff or termination notices. The majority has failed to recognize that "the

exercise of free speech in union organization campaigns should not be narrowly restricted." *N.L.R.B. v. Fisher Cheese Co.,* 652 F.2d 607, 608 (6th Cir.1980). *Accord N.L.R.B. v. Lenkurt Electric Co.,* 438 F.2d 1102, 1108 (9th Cir.1971).

> "It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right."

*Id.* at 1108. The Board's narrow construction of the employer's right to exercise free speech which is endorsed by the majority will no longer allow employees to make a knowledgeable and reasoned choice based on factual information.[2] Millions of dollars of business is lost annually to foreign markets in part due to labor costs. Our courts as well as the Board must be aware of and consider these economic realities of life when reaching decisions. "Courts not only have the obligation to operate within the law, but must also continue to be aware of economic reality . . . ." *Air Line Stewards, etc. v. Trans World Airlines,* 713 F.2d 319, 323 (7th Cir.1983).

Nor does the majority realize that it is "important to avoid discovering veiled threats or sinister ambiguities by placing a strained interpretation on the employer's remarks." Bok, *Regulating NLRA Election Tactics,* 78 Harv.L.Rev. 38, 77 (1964). Here, Harrison is being faulted for informing its employees of the possible effect of the action the customer providing its "economic lifeblood" said it would take if unionization occurred. I would hold that there is no "veiled threat" under such circumstances and refuse to join in support of the Board's strained interpretation of Harrison's statements. The majority's decision unnecessarily ties the hands of employers and prevents them from honestly and truthfully informing employees of the possible adverse conse-

quences of unionization. Accordingly, I would deny enforcement of that portion of the Board order relating to those statements referred to in this dissent.

---

2. There is authority for the proposition that employers' statements have little influence on employees. A lengthy empirical study indicates that employees make their choice early in a representation campaign and subsequent campaigning does not alter pre-campaign attitudes. J. Getman, S. Goldberg & J. Herman, *Union Representation Elections: Law and Reality,* (1981). *See also* Getman, Goldberg and Herman, *Union Representation Elections: Law and Reality: The Authors Respond to the Critics,* 79 U.Mich.L.Rev. 564 (1981). The authors advocate "wholly free speech" during campaigns. *Id.* at 564.