**STRIPCO SALES, INC.,**
Petitioner–Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent–Cross–Petitioner.

**Nos. 89–3781 and 90–1299.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1990.

Decided June 6, 1991.

Lawrence J. Casazza, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for Stripco Sales, Inc.

John C. Truesdale, Judith A. Dowd, John Fawley, Aileen A. Armstrong, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., William T. Little, N.L.R.B., Indianapolis, Ind., for N.L.R.B.

Before BAUER, Chief Judge, and POSNER and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Chauffeurs, Teamsters and Helpers Local Union No. 364, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union) filed a petition to represent the employees of Stripco Sales, Inc. (Stripco). The Union won an election among Stripco's employees to determine whether the Union would serve as their representative. Stripco filed its objections to the election with the National Labor Relations Board (Board). The Board denied the objections. When Stripco refused to bargain with the Union, the Board determined this refusal to be unlawful and ordered Stripco to bargain with the Union. Stripco filed this petition for review, and the Board filed a cross-application for enforcement. For the following reasons, we deny the petition for review and enforce the order.

## I

## BACKGROUND

On July 28, 1988, the Union filed a petition to represent certain employees of Stripco. An election was conducted on September 15, 1988; 29 votes were cast in favor of representation by the Union, and 26 votes were cast against such representation. Stripco filed its objections to the election on September 22, 1988. Stripco alleged that the Union had threatened an employee with the loss of pension benefits in an attempt to coerce that employee to refrain from voting, that the Union threatened and intimidated employees, and that these events, taken together, created an atmosphere of coercion.

The Board conducted a hearing concerning Stripco's objections. On December 23, 1988, the hearing officer issued a report recommending that the Board overrule Stripco's objections. Stripco filed exceptions to the hearing officer's report. The Board subsequently adopted the decision of the hearing officer and certified the Union as the employees' collective bargaining representative.

When the Union attempted to begin collective bargaining with Stripco, Stripco refused to bargain on the ground that the Board's certification of the Union was improper. The Union then filed an unfair labor practice charge with the Board. In its answer, Stripco admitted that it refused to bargain with the Union and continued to contest the Union's certification. On December 14, 1989, the Board entered its Decision and Order. It found that Stripco's refusal to bargain with the Union violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1), which require employers to bargain collectively with the appropriate employee representatives. The Board's order requires Stripco to bargain with the Union. Stripco now challenges the Board's order in this petition and again contests the propriety of the Union's certification.

## II

## ANALYSIS

A. *Standard of Review*

Our review of the Board's decision to certify a collective bargaining representa-

tive after an election has been conducted is "extremely limited." *NLRB v. Browning–Ferris Indus. of Louisville, Inc.*, 803 F.2d 345, 347 (7th Cir.1986); *see also NLRB v. Tom Wood Datsun, Inc.*, 767 F.2d 350, 352 (7th Cir.1985). We must enforce the Board's order if, after viewing the record as a whole, the order is supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "In the context of a challenge to an election, the challenging party 'must establish that there is not substantial evidence supporting the conclusion that any election irregularities did not "so impair the integrity of the ballot result that invalidation of the election is necessary." ' " *Browning–Ferris*, 803 F.2d at 347 (quoting *NLRB v. Affiliated Midwest Hosp., Inc.*, 789 F.2d 524, 528 (7th Cir.1986) (quoting *NLRB v. Southern Health Corp.*, 514 F.2d 1121, 1123 (7th Cir.1975))).

### B. *Application to This Case*

■ Each of the arguments advanced by Stripco is based on factual determinations by the Board that explicitly turned on the hearing officer's assessment of credibility and demeanor. Such determinations "may not be overturned absent the most extraordinary circumstances such as utter disregard for sworn testimony or the acceptance of testimony which on its face is incredible." *Tuf–Flex Glass v. NLRB*, 715 F.2d 291, 295 (7th Cir.1983). The hearing officer's task in this case was particularly difficult because of the inconsistent testimony from various witnesses (and occasionally the same witness). The hearing examiner had "the painstaking and, given the inconsistency of narratives emanating in some cases from the very same witness, exasperating task of winnowing the most likely version of the pre-election events." *Id.* Here, the Board based its decision on the hearing officer's credibility determinations and reasonable inferences drawn from the evidence. We shall not normally second-guess such findings even if other interpretations of the record are also permissible. *See NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 836 n. 9 (7th Cir.1984).

### 1. Threats and coercion concerning possible pension loss

■ Stripco first argues that the Union threatened Max Worsham, a janitor for Stripco and member of the Union for 24 years while working for a previous employer, with the loss of his pension benefits if he voted in the election. The Union presented evidence, accepted by the hearing officer and adopted by the Board, concerning Worsham's failure to vote. According to the Union, Worsham came into the Union's office on August 17, 1988 because he was concerned about his pension benefits (Worsham apparently was concerned that his work for Stripco would jeopardize his receipt of pension benefits). During his visit to the Union office, Worsham spoke with Union business agent Robert Warnock III about both his pension and the status of the Union campaign. Worsham gave Warnock his telephone number and indicated that he was amenable to future campaign discussions.

Warnock ultimately telephoned Worsham in September to ask if they could meet again to discuss the campaign. Worsham agreed. The arranged meeting occurred on September 13; Worsham continued to express concern about his pension, this time to another Union business agent, Gary Monroe, who was also present at the meeting. Although Monroe and Warnock were unable to answer Worsham's questions, they showed Worsham a letter from his file indicating that his employment with Stripco did not affect adversely his pension eligibility. When Monroe inquired about Worsham's views on the forthcoming election, Worsham indicated that he was indifferent to the results. Because Worsham was indifferent, Monroe asked him not to vote in the election.

Stripco presented a somewhat different version of the events that led to Worsham's failure to vote in the Union election. Worsham testified that he met with Warnock and Monroe at the Union Hall on September 13, 1988. The meeting began with Warnock asking Worsham how the Union campaign was proceeding. Worsham an-

swered that he did not know the status of the campaign because other Stripco employees did not speak with him. At the hearing, Worsham testified as follows:

Q. BY MR. TIERNEY: Yes. What was said and what was shown to you? Do you have the meeting in mind, Max?

A. BY MR. WORSHAM: Okay. I remember right, the best of my ability, Gary [Monroe] said that we're going to lose a vote, but we're going to win the election. And if my name and social security number were sent into the pension fund, we'd all be in trouble. And I—and then he brought me out a letter, showed me a letter. This gentleman had retired from the Teamsters, was driving a truck again, and he got caught; and it was going to cost him approximately $20,000.

And then Bob Warnock said, Bob Warnock wanted to know if I would agree to stay home that day. I said—I promised him I would, because I had work to do at home....

Q. Okay. Max, why did you agree to stay home and not to vote?

A. Well, I was kind of concerned about my pension. My name, like I say, my name, and my social security number would be on there; and if [the pension fund] would get it, he said, we'd all be in trouble.

Q. Okay. Who said "we'd all be in trouble?"

A. I think it was Bob.

Q. Bob Warnock?

A. Right.

Q. And if you had not—well, if you had not had that conversation, would you have voted?

A. Yes, I would have.

Tr. at 43–44.

Stripco also points to the apparent contradiction between the testimony of War-

nock and Monroe in support of its argument that these two Union officials coerced Worsham not to vote in the election. Warnock testified that he and Monroe discussed the idea of attempting to dissuade Worsham from voting, and that the purpose for the September 13 meeting with Worsham was to prevent him from voting. However, Monroe testified that no such preliminary discussions occurred. On the basis of this contradiction, as well as the testimony of Worsham, Stripco argues that its version of the events is more credible than that advanced by the Union.

No credited evidence demonstrates that either Monroe or Warnock indicated to Worsham that his continued receipt of pension benefits was contingent on his decision whether to vote. "The Board has the primary responsibility for determining whether statements are to be construed as threats[,] ... and the Board's decision in this regard will not be disturbed on appeal 'if the record as a whole reveals substantial evidence in support of the finding.'" *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 837 (7th Cir.1984) (quoting *NLRB v. Lucy Ellen Candy Div. of F. & F. Lab., Inc.*, 517 F.2d 551, 557 (7th Cir.1975)). In this case, the hearing officer determined that the Union's conduct did not prevent Worsham from voting.[1] After reviewing the record, we believe that substantial evidence supports the hearing officer's determination that the statements of Warnock and Monroe did not coerce Worsham such that his free will was impeded. In deciding which narrative to accept, the hearing officer was required to make a credibility determination. As we have noted above, if a Board decision is based primarily upon the credibility determinations of the hearing officer, we normally will not second-guess such findings even if other interpretations of the record are possible.[2] Here, the hear-

1. The hearing officer determined that Worsham was free to refuse the request that he not vote. Consequently, this case is not analogous to those cases in which the Union coupled its request with a threat. *See, e.g., G.H. Hess, Inc.*, 82 N.L.R.B. 643 (1949) (setting aside election in which union threatened employee with economic reprisal and bodily harm if she voted).

2. *See also NLRB v. Stor–Rite Metal Prods., Inc.*, 856 F.2d 957, 964 (7th Cir.1988) ("Because only the [hearing officer] can view the demeanor of the witnesses, any of the [hearing officer's] findings that turn on express or implied credibility determinations take on particular significance on review."); *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 836 n. 9 (7th Cir.1984) ("reviewing court must accept Board's credibility

ing officer, pointing to numerous inconsistencies within Worsham's testimony and his inability to remember various details,[3] found the Union's witnesses more credible. Because credibility played such a crucial role in determining this issue, we conclude that the hearing officer's findings were supported by substantial evidence.

### 2. Property damage

■ Stripco cited two incidents that occurred prior to the election in support of its claim that the Union engaged in misconduct sufficient to warrant setting aside the election. Stripco alleged that the Union intimidated and coerced employees by vandalizing the automobiles of Haracleo Lopez, a Stripco employee who refused to sign a union card, and Paul Larson, a supervisor. Both Lopez and Larson eventually told other employees that the Union was responsible for the property damage. Lopez' car was vandalized in Stripco's unfenced parking lot on August 15, 1988; Larson's car was vandalized in front of his home on the night of August 16, 1988.

The hearing officer was "not persuaded that there is a sufficient nexus between the vandalism and the Union." Petitioner's App. at 10. Consequently, he was not persuaded that these incidents impacted upon the election. Stripco presented no credited, substantive evidence that in any way indicated that the Union was involved in the incidents. No Union supporter claimed involvement in the vandalism. In fact, the

findings unless the party challenging the credibility determinations establishes exceptional circumstances").

3. The hearing officer noted that Worsham originally testified that Monroe made the threat regarding his pension, but later testified that Warnock made the threat. Moreover, Worsham initially denied that, prior to September 13, 1988, he had ever discussed any matter at the Union Hall; Worsham was then impeached with his prior sworn statement, which mentioned the August 17 meeting at the Union Hall. Worsham also was vague as to whether he thought he was eligible to vote in the election. These facts, coupled with the credited aspects of Warnock's and Monroe's testimony, are sufficient to support the hearing officer's decision.

Union presented evidence that it called a meeting to disclaim any responsibility for vandalism and instructed Union supporters not to engage in such violence. Moreover, the vandalism occurred more than a month before the date of the election.

This court has noted that improper acts of a third party are less damaging to the validity of an election than acts of the union or the employer. *See State Bank of India v. NLRB,* 808 F.2d 526, 539 (7th Cir.1986). The policy of according less weight to the conduct of third parties recognizes that "neither unions nor employers can prevent misdeeds or misstatements by persons over whom they have no control." *NLRB v. Griffith Oldsmobile, Inc.,* 455 F.2d 867, 870 (8th Cir.1972). Moreover, we have required parties seeking to overturn an election because of such coercive conduct to carry a heavy burden: the coercive conduct must have so influenced potential voters that free choice was impossible. *See NLRB v. Chicago Marine Containers, Inc.,* 745 F.2d 493, 500 (7th Cir.1984); *see also NLRB v. Advanced Sys., Inc.,* 681 F.2d 570, 575 (9th Cir.1982). Substantial evidence supports the Board's conclusion that the few third-party acts that occurred before the election did not so influence potential voters as to require a new election.[4]

### 3. Physical violence

■ Sotero Rodriguez, a Stripco supervisor, was involved in a physical altercation

4. As the D.C. Circuit stated in *Amalgamated Clothing & Textile Workers Union v. NLRB,* 736 F.2d 1559, 1568 (D.C.Cir.1984):

Acts of vandalism occur with alarming frequency in our society—even in parking lots. Given the difficulties that police departments have in controlling vandalism generally, it would hardly be fair to require the union and its supporters to keep the community free of vandalism while a representation election is going on. At any rate, the law is well settled that such minor incidents of property damage are insufficient to overturn an election.

*See also NLRB v. Hydrotherm, Inc.,* 824 F.2d 332, 336–37 (4th Cir.1987) (vandalism of car owned by employee who spoke out against union did not taint election results); *NLRB v. Idab, Inc.,* 770 F.2d 991, 998–99 (11th Cir.1985) (property damaged by unknown persons insufficient to set aside election results).

with Juan Trujillo, a pro-Union employee. Rodriguez testified that he had reassigned Trujillo from one machine to another just ten minutes before the incident. Trujillo snuck up behind Rodriguez and squeezed him so tightly that Rodriguez could not breathe. Trujillo continued the attack until Rodriguez bent one of Trujillo's fingers back towards Trujillo's wrist. Rodriguez also testified that, after he escaped, Trujillo threw a punch at him.

Trujillo described the incident differently. He testified that he saw Rodriguez shadow boxing with other employees and decided to join the horseplay. He grabbed Rodriguez and held him tightly for about fifteen seconds. When he realized that Rodriguez was not taking the bearhug as a joke, Trujillo released Rodriguez. Rodriguez then elbowed Trujillo.

The hearing officer, based on credibility determinations, found Trujillo's testimony more believable than that of Rodriguez. Moreover, the hearing officer stated that, even if Rodriguez' version of the events were accepted, the incident clearly was personal in nature. Stripco, however, seeks to characterize the incident as an unprovoked attack in front of unit employees in an attempt by the Union to indicate its willingness to use violence. Despite this characterization, we believe that Stripco has failed to meet its burden of establishing that the Board's decision is unsupported by substantial evidence. *See NLRB v. Browning-Ferris Indus. of Louisville, Inc.*, 803 F.2d 345, 347 (7th Cir.1986). As with the other arguments advanced by Stripco, credibility judgments by the hearing officer played a key role in determining the underlying facts. Stripco has not shown exceptional circumstances sufficient to challenge the hearing officer's credibility determination. Thus, we must accept the Board's decision to credit the testimony of Trujillo and to find that the incident between Trujillo and Rodriguez did not warrant setting aside the election results. It is unfortunate that representation elections tend to propagate conflict; every such instance, however, does not justify a new election. *See NLRB v. Southern Health Corp.*, 514 F.2d 1121, 1123 (7th Cir.1975)

("the election environment itself produces many instances of campaign impropriety which employees frequently disregard").

## Conclusion

For the reasons stated above, Stripco's petition for review is denied, and the Board's cross-application for enforcement is granted.

PETITION FOR REVIEW DENIED; CROSS-APPLICATION FOR ENFORCEMENT GRANTED.